# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARIA TORRES and MELCHOR
TORRES, individually and as
Administrators of the Estate of
Everardo Torres,
              *Plaintiffs-Appellants,*

                    v.

CITY OF MADERA; MARCY NORIEGA,
individually and as a member of
the Madera Police Department;
DOES 1-50,

              *Defendants-Appellees.*

No. 09-16573

D.C. No.
1:02-cv-06385-
AWI-GSA

OPINION

Appeal from the United States District Court
for the Eastern District of California
Anthony W. Ishii, Chief District Judge, Presiding

Argued and Submitted
February 24, 2011—Seattle, Washington

Filed August 22, 2011

Before: Betty B. Fletcher, Eugene E. Siler,* and
Michael Daly Hawkins, Circuit Judges.

Opinion by Judge Hawkins;
Concurrence by Judge Siler

---

*The Honorable Eugene E. Siler, Senior Circuit Judge for the Sixth Circuit, sitting by designation.

11317

**COUNSEL**

Thomas A. Brill, Young & Nichols, Bakersfield, California, for the plaintiffs-appellants.

Bruce D. Praet, Ferguson, Praet & Sherman, Santa Ana, California, for the defendants-appellants.

**OPINION**

HAWKINS, Senior Circuit Judge:

While handcuffed in the back seat of a patrol car, Everardo Torres ("Everardo") was mortally wounded when Madera City Police Officer Marcy Noriega ("Officer Noriega") shot him in the chest with her Glock semiautomatic pistol, believing it at the time to be her Taser M26 stun gun. Everardo's family filed this survival action under 42 U.S.C. § 1983, asserting excessive force in violation of the Fourth Amendment, and now appeals from an adverse grant of summary judgment. Consistent with the Fourth Circuit's decision in *Henry v. Purnell*, ___ F.3d ___, 2011 WL 2725816 (4th Cir. July 14, 2011) (en banc),[1] we reverse and remand for trial.

**FACTS AND PROCEDURAL HISTORY**

**I.   Background[2]**

---

[1]There, an officer intending to deploy a Taser device instead drew and fired his service weapon, wounding an unarmed suspect fleeing arrest. The Fourth Circuit held that, viewing the evidence in the light most favorable to the nonmovant, the officer's actions were not objectively reasonable and furthermore violated clearly established law prohibiting the use of deadly force against suspects who pose no significant threat of death or serious physical injury to others. *Henry*, ___ F.3d ___, 2011 WL 2725816, at *6, *8.

[2]Because this appeal comes to us on summary judgment, we accept plaintiff's version of facts as true. *See Liberal v. Estrada*, 632 F.3d 1064, 1068 n.1 (9th Cir. 2011).

In the course of responding to a complaint of loud music on October 27, 2002, Madera City Police officers arrested Everardo and Erica Mejia ("Mejia"), handcuffed them, and placed them in the back seat of a patrol car. After approximately thirty to forty-five minutes (during which time Everardo had fallen asleep), Mejia was removed from the car and replaced by another arrestee. Everardo awoke at this time and began yelling and kicking the rear car door from inside, though the parties dispute whether he was yelling, "Get me out of the car," or simply that his handcuffs were too tight.

Officer Noriega, one of several police officers on site that evening, was standing a few feet directly behind the patrol car when she first heard Everardo yelling. She recalls telling her fellow officers that whoever was closest should tase Everardo because he could injure himself if he kicked through the glass window. As it turned out, Officer Noriega herself was closest, so she approached the car. Upon reaching the rear driver's side door, she opened it with her left hand.[3] She then reached down with her right hand to her right side, unsnapped her holster, removed the Glock, aimed the weapon's laser[4] at Everardo's center mass, put her left hand under the gun, and pulled the trigger, all without looking at the weapon in her hand. She had turned off the safety to her Taser earlier that evening, enabling her to use it more quickly. The parties agree that Officer Noriega had intended to reach for her Taser, which she kept in a thigh holster immediately below her holstered Glock on her dominant right side, and that she had intended to use her Taser in dart-tase rather than touch-tase mode.[5] Everardo died later that evening from the gunshot wound.

---

[3]Officer Noriega claims that she yelled a warning at Everardo to stop kicking or he would be tased, but that he did not stop and kicked the car door into her as she opened it. The Torres Family disputes these facts, which are contradicted by Mejia's deposition testimony.

[4]Both Officer Noriega's Glock and Taser were equipped with laser-sighting devices.

[5]*See generally Bryan v. MacPherson*, 630 F.3d 805, 824 & nn.2-4 (9th Cir. 2010) (describing the type and amount of force applied by a Taser used in dart-tase mode).

This was not the first time Officer Noriega had mistakenly drawn the wrong weapon, though never before with such dire consequences. The Madera City Police Department first issued Officer Noriega a Taser, and certified her to use it, sometime in the winter of 2001, less than one year before Everardo's shooting. Her certification training consisted of a single three-hour class, during which she fired the weapon only once. She was given a right-side holster for her Taser and instructed to wear it just below her Glock. There was no discussion during this training session of a recent incident in which a Sacramento officer had mistaken his handgun for his Taser.[6]

Nonetheless, Officer Noriega soon came to experience firsthand the risk of confusing the two weapons, both all-black and of similar size and weight. The first incident occurred about a month and a half after she was first issued the Taser when she was at a jail putting her weapons back in their holsters. She mistakenly put her Glock into the Taser holster, realizing her error when the weapon did not "sit right" in the wrong holster. Concerned about the mistake, she notified her sergeant, Sergeant Lawson, who instructed her to practice putting each weapon in its proper holster and to practice drawing them.

Just one week later, Officer Noriega again confused her weapons, this time during a field call. Seeking to touch-tase a kicking and fighting suspect who refused to get into the back seat of a patrol car, Officer Noriega instead pulled out her Glock. Only when she tried unsuccessfully to remove the cartridge, which would have been present on her Taser but was not a feature on her Glock, did she realize she was holding the wrong weapon "and it was pointing at [her] partner's head, the [Glock's] laser was pointing at his head." Fright-

---

[6]This instance of weapon confusion occurred on March 10, 2001 and became the subject of a different lawsuit. *See Yount v. City of Sacramento*, 43 Cal. 4th 885, 889 (2008).

ened by this second incident of weapon confusion and by how narrowly she had averted a potentially fatal mistake, she again informed Sergeant Lawson, explaining that she "had pulled out my gun thinking it was my Taser." Again, Sergeant Lawson instructed her "to keep practicing like he's been doing and that he's having everybody do."

For the next nine months, leading up to the day of Everardo's tragic shooting, Officer Noriega followed her sergeant's instructions, practicing drawing her two weapons daily, both before work and during downtime throughout each shift. Officer Noriega described her daily self-training as follows: "I would have both my gun and my taser in their holsters. And I would draw my taser, and then I would draw my gun. And in my mind thinking taser, taser, taser, gun, gun, taser. Just practicing that way so I would draw, draw, draw." In the five or so times she used her Taser in the field, never again did she confuse her two weapons, until the night of Everardo's shooting. On all previous occasions, however, she had only touch-tased the subjects, which required her first to remove the Taser's safety cartridge. Never before had she dart-tased anyone, as she had intended to do to Everardo.

## II.  Procedural History

Everardo's parents, Maria and Melchor Torres ("the Torres Family"), as administrators of his estate, brought this action under 42 U.S.C. § 1983, asserting violation of Everardo's Fourth Amendment right against unreasonable seizure and seeking damages from Officer Noriega.[7] The district court initially granted Officer Noriega's motion for summary judgment, determining Everardo was not "seized" by Officer Noriega's unintended use of her Glock and therefore no Fourth Amendment violation occurred.

---

[7]None of plaintiffs' other claims are at issue here.

On interlocutory appeal, we reversed, concluding that under the Ninth Circuit's longstanding "continuing seizure" doctrine, Everardo was seized within the meaning of the Fourth Amendment at the time of the shooting. *Torres v. City of Madera*, 524 F.3d 1053, 1056 (9th Cir. 2008) ("*Torres I*").[8] We held that Officer Noriega's conduct was therefore governed by Fourth Amendment reasonableness analysis, and we remanded for the district court to consider in the first instance whether Officer Noriega's mistake in using her Glock rather than her Taser was objectively unreasonable, for only then would Everardo have suffered a constitutional injury. *Id.* at 1056-57.

On remand, the district court found Officer Noriega's mistake was reasonable as a matter of law and determined she was entitled to qualified immunity in any event because it would not have been clear to a reasonable officer in 2002 that a mistaken use of force violated the Fourth Amendment. The Torres Family again appealed.[9]

## STANDARD OR REVIEW

A district court's grant of summary judgment is reviewed de novo, as is its determination of whether an officer's actions entitle her to qualified immunity. *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1019 (9th Cir. 2009). Summary judgment is appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most

---

[8]The "continuing seizure" doctrine provides that "once a seizure has occurred, it continues throughout the time the arrestee is in the custody of the arresting officers." *Robins v. Harum*, 773 F.2d 1004, 1010 (9th Cir. 1985). Not all circuits adopt this approach. *See Torres I*, 524 F.3d at 1056 nn.3 & 4.

[9]The district court entered final judgment in favor of defendants on the § 1983 claim and certified this matter for appeal pursuant to Federal Rule of Civil Procedure 54(b) on November 18, 2009. We therefore have jurisdiction under 28 U.S.C. § 1291, notwithstanding pendency of the remaining state law claims.

favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009). Where the objective reasonableness of an officer's conduct turns on disputed issues of material fact, it is "a question of fact best resolved by a jury," *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003); only in the absence of material disputes is it "a pure question of law," *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007).

## DISCUSSION

Qualified immunity is " 'an entitlement not to stand trial or face the other burdens of litigation.' " *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)), *abrogated in part on other grounds by Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 817-18 (2009). Accordingly, we must resolve "immunity questions at the earliest possible stage in litigation." *Pearson*, 129 S. Ct. at 815.

**[1]** An officer will be denied qualified immunity in a § 1983 action only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood her conduct to be unlawful in that situation. *Saucier*, 533 U.S. at 201-02; *Liberal v. Estrada*, 632 F.3d 1064, 1076 (9th Cir. 2011). To assist the "development of constitutional precedent," we exercise our "sound discretion" to follow *Saucier*'s conventional two-step procedure and address first whether the Torres Family has alleged the violation of a constitutional right. *See Pearson*, 129 S. Ct. at 818.

## I. Violation of a Constitutional Right

### A. Legal Standard

**[2]** An objectively unreasonable use of force is constitutionally excessive and violates the Fourth Amendment's prohibition against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394-96 (1989); *Tekle v. United States*, 511 F.3d 839, 844 (9th Cir. 2007). Determining the reasonableness of an officer's actions is a highly fact-intensive task for which there are no per se rules. *Scott*, 550 U.S. at 383. We recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *Graham*, 490 U.S. at 397, and that these judgments are sometimes informed by errors in perception of the actual surrounding facts.

**[3]** Not all errors in perception or judgment, however, are reasonable. While we do not judge the reasonableness of an officer's actions "with the 20/20 vision of hindsight," *id.* at 396, nor does the Constitution forgive an officer's every mistake. *See Maryland v. Garrison*, 480 U.S. 79, 87 n.11 (1987). Rather, we adopt "the perspective of a reasonable officer on the scene . . . in light of the facts and circumstances confronting [her]." *Graham*, 490 U.S. at 396. Where an officer's particular use of force is based on a mistake of fact, we ask whether a reasonable officer would have or *should* have accurately perceived that fact. *Jensen v. City of Oxnard*, 145 F.3d 1078, 1086 (9th Cir. 1998) (mistaken shooting of fellow police officer was unreasonable if it occurred in conditions in which the officer *should* have been able to recognize the figure before him); *see also Wilkins*, 350 F.3d at 955 (same); *cf. Garrison*, 480 U.S. at 86 (validity of warrantless search that resulted from a mistake of premises turned on whether the officers "had known, or should have known" about the condition precipitating the error).

**[4]** Standing in the shoes of the "reasonable officer," we then ask whether the severity of force applied was balanced by the need for such force considering the totality of the circumstances, including (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396; *Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1115 (9th Cir. 2005).

## B. Analysis

**[5]** The question that confronts us now is whether Officer Noriega's conduct in mistakenly applying deadly force to Everardo was objectively unreasonable under the totality of the circumstances. In *Jensen*, we held that

> [i]f, as is alleged in the complaint, [the officer defendant] shot Officer Jensen three times in the back from a distance of three feet *in conditions in which he should have been able to recognize* that the figure he was shooting was a fellow officer, such a use of force would be unreasonable.

145 F.3d at 1086 (emphasis added). Similarly here, if Officer Noriega knew or should have known that the weapon she held was a Glock rather than a Taser, and thus had been aware that she was about to discharge deadly force on an unarmed, non-fleeing arrestee who did not pose a significant threat of death or serious physical injury to others, then her application of that force was unreasonable. *See Tennessee v. Garner*, 471 U.S. 1, 3 (1985). That she intended to apply lesser force is of no consequence to our inquiry, for objective reasonableness must be determined "without regard to [the officer's] underlying intent or motivation." *Graham*, 490 U.S. at 397. Just as "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force[,] nor will an officer's good intentions make an objectively

unreasonable use of force constitutional." *Id.* (citing *Scott v. United States*, 436 U.S. 128, 138 (1978)).

To guide the determination of whether Officer Noriega should have known she was holding the wrong weapon, we identified five factors for consideration in *Torres I*:

> (1) the nature of the training the officer had received to prevent incidents like this from happening; (2) whether the officer acted in accordance with that training; (3) whether following that training would have alerted the officer that [s]he was holding a handgun; (4) whether the defendant's conduct heightened the officer's sense of danger; and (5) whether the defendant's conduct caused the officer to act with undue haste and inconsistently with that training.

524 F.3d at 1057 (citing *Henry v. Purnell*, 501 F.3d 373, 383 (4th Cir. 2007)).

The district court considered these factors and found: (1) Officer Noriega "did act inconsistently with what she had practiced"; (2) "to the extent [Everardo]'s own conduct created a heightened sense of danger, that sense of danger was focused on [Everardo]'s danger to himself, not any personal danger [Officer] Noriega felt for her own safety or the safety of others"; and (3) there was a "lack of evidence from [Officer] Noriega that she actually felt danger and that she had to act hastily."

**[6]** Nevertheless, the district court chose to discount these factors, relying instead on the following findings: (1) Officer Noriega's formal training was minimal and contained no discussion of "other incidents where officers confused their weapons"; (2) although her two previous instances of weapons confusion had prompted her to practice drawing her weapons, she lacked "formal training on this potential mistake

if both weapons were worn on the dominant side"; and (3) Everardo's conduct in kicking the door into Officer Noriega as she opened it "forced" her to "make a split-second judgment in a tense, uncertain, and rapidly evolving situation about firing a weapon." The district court concluded that "[a]ll factors at least tilt toward finding that [Officer] Noriega's mistake was reasonable."

The standard on summary judgment review requires that we "draw all reasonable inferences in favor of [the Torres Family], the nonmoving party," and prohibits us from "substitut[ing] [our] judgment concerning the weight of the evidence for the jury's." *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003); *see also Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1123-24 (9th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Because the reasonableness standard "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) (citing *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997)).

**[7]** Here, a reasonable jury could weigh the significance of Officer Noriega's risk awareness and daily practice differently from the way in which the district court weighed those factors. First, to the extent the district court found it relevant that Officer Noriega's formal training contained no discussion of the risks of weapon confusion, a reasonable jury could find that Officer Noriega's two experiences confusing the Glock and the Taser should have alerted her to the risks involved, even absent formal discussion. Second, while it did not "give[ ] much weight" to the first weapon confusion incident, even the district court acknowledged that "this incident does show a general confusion by [Officer] Noriega in having both weapons holstered on the dominant side." Third, the district

court minimized the importance of Officer Noriega's "informal" daily practice by distinguishing it from "formal training," without explaining the relevance of such an arbitrary distinction—one which we did not intend to invite in *Torres I.*

Officer Noriega's daily practice drawing the two weapons was conducted pursuant to Sergeant Lawson's instructions, and, as the Torres Family argues, the definition of "training" does not necessarily require supervision and can include "the skill, knowledge, or experience acquired by . . . instruction, discipline, or drill." *Merriam Webster's Collegiate Dictionary* 1326 (11th ed. 2004). Accordingly, a reasonable jury could conclude from the totality of this evidence that Officer Noriega had trained for nine months specifically to prevent incidents of weapon confusion like this from happening, that she did not act in accordance with what she had practiced on the evening of Everardo's shooting, and that had she done so, Everardo's death could have been avoided.

**[8]** A reasonable jury could also differ from the district court in weighing the contributory role of Everardo's conduct. The district court reasoned that Officer Noriega's daily practice did not prepare her to avoid weapon confusion in the "tense, uncertain, and rapidly evolving" circumstances that she encountered in the field that October night, finding that Everardo's conduct in kicking the door into Officer Noriega as she opened it escalated her sense of danger. *See Graham*, 490 U.S. at 396-97. But a genuine issue of material fact exists as to whether this was the type of "rapidly evolving" situation to which *Graham* referred. Officer Noriega testified that Everardo's conduct did not cause her to fear for her own safety or that of others. Her only stated concern was for Everardo's own well-being, but a jury might question the reasonableness of choosing to send 1,200 volts of electricity[10] through a person when the alleged concern is for that person's safety.

---

[10]*See Bryan*, 630 F.3d at 824 n.4 (describing the amount of voltage delivered by a Taser).

**[9]** In addition, instead of finding that the circumstances "forced [Officer Noriega] to make a split-second judgment" about firing a weapon, a reasonable jury could conclude that her own poor judgment and lack of preparedness caused her to act with undue haste. *See, e.g.*, *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001) (distinguishing *Graham* where officer had opportunity to observe the suspect "for a considerable period of time prior to firing at him," "opportunity to consult" with fellow officers concerning the tactics to be employed, and a clear line of escape). Far from being a fleeing suspect whose risk of danger to others may be hard to ascertain, Everardo was handcuffed and sitting in the back seat of a patrol car, and Officer Noriega both knew that he was kicking the door and intended to tase him when she first started to approach the car. Thus, it is unclear whether Everardo's conduct changed in a way that created "rapidly evolving" conditions such as would require Officer Noriega to change her course of conduct mid-stream. Had Officer Noriega drawn her weapon *before* opening the car door, a jury could infer that the conditions would have been much more akin to her practice conditions. There remains a genuine dispute, therefore, as to whether a reasonable officer in her position would have waited to draw her weapon until *after* beginning to open the door, perhaps unnecessarily creating her own sense of urgency.

**[10]** Finally, the district court seemed swayed by the lack of evidence that Officer Noriega's mistake when she shot Everardo "was anything other than an honest one." As noted earlier, however, under *Graham*, whether the mistake was an *honest* one is not the concern, only whether it was a *reasonable* one. *See Graham*, 490 U.S. at 397. Taking into account all the facts and circumstances facing Officer Noriega at the time of the mistaken shooting, a reasonable jury could find that her mistake was unreasonable because her own prior incidents of weapon confusion put her on notice of the risk of repetition, her daily practice drawing weapons at her sergeant's instruction equipped her with the training to avoid such inci-

dents, and the non-exigent circumstances surrounding Everardo's deadly shooting did not warrant such hasty conduct heightening the risk of weapon error. *Cf. Wilkins*, 350 F.3d at 955; *Jensen*, 145 F.3d at 1086.

**[11]** Here, there is no dispute that Everardo had committed no serious offense, though acting out, posed no immediate threat to Officer Noriega's safety or that of anyone else, and, far from "attempting to evade arrest by flight," was sitting handcuffed in the back seat of a patrol car. The amount of force ultimately applied was a lethal shot from a semiautomatic handgun. Thus, if a jury were to find Officer Noriega's mistaken belief that she was holding her Taser rather than her Glock unreasonable, her use of force in this situation was excessive and violated Everardo's Fourth Amendment rights. Because there remain material factual issues in dispute on which a jury could make such a finding, the Torres Family has properly alleged the violation of a constitutional right, and summary judgment based on failure to do so was improper.

## II. Qualified Immunity

**[12]** We must next consider whether Officer Noriega is nonetheless entitled to qualified immunity because the alleged unlawfulness of her conduct was not clearly established as of October 27, 2002, for the "inquiries for qualified immunity and excessive force remain distinct." *Saucier*, 533 U.S. at 204. While the constitutional violation prong concerns the reasonableness of the officer's *mistake of fact*, the clearly established prong concerns the reasonableness of the officer's *mistake of law*:

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the *legal constraints* on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.

An officer might correctly perceive all of the rele-
vant facts but have a *mistaken understanding as to
whether a particular amount of force is legal in
those circumstances*. If the officer's mistake as to
what the law requires is reasonable, however, the
officer is entitled to the immunity defense.

*Saucier*, 533 U.S. at 205 (emphasis added); *see also Wilkins*,
350 F.3d at 955 (at the second step, the court must inquire
"whether the officer was reasonable in his belief that his con-
duct did not violate the Constitution"); *Curley v. Klem*, 499
F.3d 199, 214 (3d Cir. 2007). Thus, for purposes of determin-
ing whether Officer Noriega is entitled to qualified immunity
under *Saucier*'s second prong, we assume she "correctly per-
ceived all of the relevant facts" and ask whether an officer
could have reasonably believed at the time that the force actu-
ally used was lawful under the circumstances.

  **[13]** The facts of this case do not fall in the " 'hazy border
between excessive and acceptable force' " as a *legal* matter.
*See Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (per
curiam) (quoting *Saucier*, 533 U.S. at 206). This is not a case
where a fleeing suspect's actions may or may not have estab-
lished probable cause to believe he posed a danger to others.
*See, e.g.*, *id.* at 200-01 (not clearly established that shooting
a disturbed felon in the course of a high-speed car chase jeop-
ardizing safety of others violated the Fourth Amendment);
*Blanford*, 406 F.3d at 1119 (not clearly established that using
deadly force against man carrying a sword, who did not heed
officers' instructions, who appeared to be breaking into a resi-
dence, and whom officers feared was a threat to others' safety
violated the Fourth Amendment); *cf. A.D. v. Markgraf*, 636
F.3d 555, 561 (9th Cir. 2011) (not clearly established that
split-second decision to use deadly force in the course of a
high-speed chase, where suspect was using her car as a
weapon, shocked the conscience in violation of substantive
due process).

**[14]** Rather, this is a case where the suspect was already arrested, handcuffed, and in the back seat of a patrol car. There is no suggestion that Everardo was armed, that he was fleeing, or that he posed a threat to any officers or anyone else. While locating the outer contours of the Fourth Amendment may at times be a murky business, few things in our case law are as clearly established as the principle that an officer may not "seize an unarmed, nondangerous suspect by shooting him dead" in the absence of "probable cause to believe that the [fleeing] suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11; *accord Brosseau*, 543 U.S. at 197-99 (reaffirming the rule of *Garner* and explaining that it provides sufficient "fair warning" of a constitutional violation in "obvious" cases); *Adams v. Speers*, 473 F.3d 989, 994 (9th Cir. 2007) (denying qualified immunity where suspect's nondangerousness and officer's failure to warn before shooting placed the case squarely "within the obvious"). Officer Noriega applied deadly force to an unarmed, nondangerous suspect, and there could be no reasonable mistake that this use of force was proscribed by law. *See Wilkins*, 350 F.3d at 955.

The district court nonetheless determined Officer Noriega was entitled to qualified immunity because the law in 2002 did not clearly establish that an unreasonable mistaken use of force violated the Fourth Amendment. But in 2001, we decided a case holding it clearly established that an allegedly unreasonable mistake of identity resulting in the use of deadly force against a fellow police officer violated that officer's Fourth Amendment right. *See Jensen*, 145 F.3d at 1086-87; *cf. Garrison*, 480 U.S. at 85-86 (lawfulness of search of wrong apartment turns on reasonableness of officers' factual mistake); *Hill v. California*, 401 U.S. 797, 803-04 (1971) (same for arrest of wrong individual). We later reaffirmed this principle in another case of mistaken identity, holding it clearly established as of January 11, 2001. *See Wilkins*, 350 F.3d at 952, 955. In both cases, we focused our qualified immunity

inquiry not on what the officer *intended* to do, but instead on the level of force actually used.

*Jensen* and *Wilkins* are materially indistinguishable from this case for purposes of qualified immunity. Although those two cases involved mistakes of identity, whereas here we deal with a mistake of weapon, we have never required a prior case "on all fours prohibiting that particular manifestation of unconstitutional conduct" to find a right "clearly established." *Deorle*, 272 F.3d at 1286*; see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987)*; Mitchell*, 472 U.S. at 535 n.12; *Bryan*, 630 F.3d at 833; *Moreno v. Baca*, 431 F.3d 633, 641 (9th Cir. 2005). To the contrary, we have repeatedly stressed that officials can still have "fair warning" that their conduct violates established law "even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 739, 741 (2002), and even when "a novel method is used to inflict injury," *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994). *See, e.g.*, *Deorle*, 272 F.3d at 1285-86 (officer violated a clearly established right when, without warning, he shot a lead-filled beanbag round in the face of a mentally or emotionally disturbed, unarmed man who had committed no serious offense, and who posed no risk of flight or danger to the officers or others); *Oliver v. Fiorino*, 586 F.3d 898, 907-08 (11th Cir. 2009) (same for officer who repeatedly tased a compliant, unarmed man not suspected of any crime, even in absence of case law factually on point).

**[15]** In *Jensen* and *Wilkins*, we held that, had the defendant officers realized that the targets they were about to shoot were fellow police officers rather than armed civilians, they "could not have reasonably believed the use of deadly force was lawful." *Jensen*, 145 F.3d at 1087; *see Wilkins*, 350 F.3d at 955. Likewise here, had Officer Noriega realized that she was pointing a Glock at Everardo's chest, she "could not have been reasonably mistaken as to the legality of [her] actions." *Wilkins*, 350 F.3d at 955. *Jensen* and *Wilkins* adequately put Officer Noriega on notice that an unreasonable mistake in the

use of deadly force against an unarmed, nondangerous suspect violates the Fourth Amendment.

The district court nonetheless reasoned that "[e]ven if the law was clear that an unreasonable mistaken use of force violated the Fourth Amendment in 2002," Officer Noriega is still entitled to qualified immunity because "the law remained unclear on *how* to determine if a mistaken use of force was reasonable or unreasonable." But this is not the proper "level of generality at which the relevant 'legal rule' is to be [defined]," *Anderson*, 483 U.S. at 639, for if it were, then qualified immunity would foreclose a trial in any case where the objective reasonableness of the officer's conduct turned on material disputes of fact. The standard for judging the objective reasonableness of an officer's actions has long been and remains today the "totality of the circumstances." The totality of the circumstances, however, will inevitably vary from case to case, and the five factors we identified in *Torres I* are merely some of the circumstances we found relevant here.

Were we to require such granular specificity under the second *Saucier* prong, we would effectively wrench of all meaning the Supreme Court's admonition that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741. While the test of whether a right is "clearly established" must not be so broad that the important shield of qualified immunity is rendered meaningless, *Anderson*, 483 U.S. at 639, nor can it be so narrow that the immunity is transformed from one "qualified" in nature to one absolute.

## CONCLUSION

**[16]** While a jury might ultimately find Officer Noriega's mistake of weapon to have been reasonable, it was inappropriate for the district court to reach this conclusion in the face of material disputes of fact. At this stage of the proceeding, Offi-

cer Noriega has not shown an entitlement to qualified immunity, and summary judgment was therefore improperly granted.

**REVERSED and REMANDED.**

---

SILER, Circuit Judge, concurring:

I concur in the majority opinion herein. However, because I was on the original panel in the Fourth Circuit in *Henry v. Purnell*, 619 F.3d 323 (4th Cir. 2010), *vacated and superceded by Henry v. Purnell*, ___ F.3d ___, 2011 WL 2725816 (4th Cir. July 14, 2011) (en banc), I should explain why I agreed in *Henry* that the officer was entitled to qualified immunity, but the officer in this case does not have that protection.

As the majority correctly states, a police officer is entitled to qualified immunity in a § 1983 action unless the officer's conduct violated a constitutional right, and the right at issue was clearly established at the time of the incident so that a reasonable officer would have understood her conduct to be unlawful in that situation. *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).

In my opinion, unlike the case law in the Fourth Circuit at the time of the conduct in *Henry*, the law in effect in the Ninth Circuit in this case was clearly established by *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003), and *Jensen v. City of Oxnard*, 145 F.3d 1078, 1086 (9th Cir. 1998). In both *Wilkins* and *Jensen*, it was a situation in which one officer shot another thinking the officer who was shot was someone else. Thus, both were situations in which the officer had a mistake of fact, thinking the victim was a criminal offender.

Moreover, in the case at bar, the person who was killed, Torres, was already secured and in the police cruiser. In con-

trast, the circumstances were that Henry was not in custody but was being pursued on foot by Officer Purnell, who had an arrest warrant for Henry.

The majority in *Henry* (en banc) found clearly established law from *Tennessee v. Garner*, 471 U.S. 1, 3 (1985), that an officer who shoots a fleeing suspect violates the suspect's Fourth Amendment rights if there was no probable cause to believe that the suspect posed a significant threat of death or physical injury to the officer or others. *Id.* Moreover, the majority in this case at bar suggests that *Garner* was the clearly established law at the time of the conduct in our case. I am not prepared to go that far, and I think we need not do so, because the precedent from *Wilkins* and *Jensen* clearly established the federal law for the Ninth Circuit to be followed in this case.