**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MICHELLE CAMERON,
*Plaintiff-Appellant*,

v.

MICHELLE CRAIG; COUNTY OF SAN DIEGO,
*Defendants-Appellees*.

No. 11-55927

D.C. No.
3:09-cv-02498-
AJB-WMC

OPINION

Appeal from the United States District Court
for the Southern District of California
Anthony J. Battaglia, District Judge, Presiding

Argued and Submitted
January 11, 2013—Pasadena, California

Filed April 16, 2013

Before: M. Margaret McKeown and Milan D. Smith, Jr.,
Circuit Judges, and Robert Holmes Bell, District Judge.[*]

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable Robert Holmes Bell, District Judge for the U.S. District Court for the Western District of Michigan, sitting by designation.

# SUMMARY[**]

## Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment and remanded in a 42 U.S.C. § 1983 action in which plaintiff alleged that her Fourth Amendment rights were violated when San Diego County defendants conspired with the father of her children, a San Diego County Sheriff's Deputy, to obtain a warrant to search her home without probable cause, used excessive force while executing that warrant, and then arrested her.

The panel held that under the totality of circumstances there was probable cause to search plaintiff's residence and to arrest her for fraudulently using the Deputy's personal credit card to obtain valuable property. The panel nevertheless held that disputed issues of material fact remained regarding plaintiff's excessive force and conspiracy claims, which alleged that six to ten Sheriff's Deputies entered her residence with guns drawn early in the morning, pointed weapons at her, grabbed her by the arms and shoulders, pushed her in the back down a hallway, and then tightly handcuffed her. Viewing the evidence in the light most favorable to plaintiff, who did not pose a threat to officer safety and was not resisting arrest, and drawing all reasonable inferences therefrom, the panel concluded that plaintiff's excessive force and conspiracy claims should go to the jury.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

James Matthew Brown, Law Office of James Matthew Brown, San Diego, California; Vanessa M. Ruggles (argued), Palm Springs, California, for Plaintiff-Appellant.

David Axtmann, Senior Deputy County Counsel (argued), San Diego, California, for Defendants-Appellees.

**OPINION**

M. SMITH, Circuit Judge:

Michelle Cameron appeals the district court's order granting summary judgment in favor of Defendants Michelle Craig and the County of San Diego (collectively, the County Defendants). Cameron alleges that her Fourth Amendment rights were violated when the County Defendants obtained a warrant to search her home without probable cause, used excessive force while executing that warrant, and then arrested her. She also brought related claims under California law. Because there was probable cause to search Cameron's residence and to arrest Cameron, we affirm the district court's entry of judgment with respect to those claims. Because disputed issues of material fact remain regarding Cameron's excessive force and conspiracy claims, however, we reverse and remand those claims to the district court for further proceedings consistent with this opinion.

**FACTUAL BACKGROUND**[1]

Michelle Cameron worked as a yoga instructor in San Diego. One of her students was San Diego County Sheriff's Deputy David Buether. The two began dating in 2004, and eventually moved in together. Some months later, Cameron became pregnant. Cameron gave birth to the couple's first child in October 2006.

Sometime afterwards, the couple agreed that Cameron should quit her job in order to work as a full-time mother. The couple opened a joint checking account, and because Cameron had no independent source of income, she also frequently used Buether's credit card to make purchases for herself and the family. Although Cameron and Buether were never married, Cameron believed the couple's finances were completely intermingled.[2]

Cameron and Buether had a second child in March 2008, but their relationship soured later that year when Cameron learned that Buether was having affairs with multiple women. After two alleged incidents of domestic violence, Buether obtained an *ex parte* restraining and "kick out" order against Cameron. She was removed from the family home by San Diego County Sheriff's Deputies the following day. As she

---

[1] Because this case comes to us on summary judgment, we present the facts in the light most favorable to Cameron. *See Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

[2] The evidence of financial intermingling is extensive. For instance, in addition to their joint checking account, Buether and Cameron were co-signers on a $125,000 home equity line to which Cameron had unrestricted access, and were also co-signers on an auto loan for a vehicle that was titled in both Buether's and Cameron's names.

was leaving, Cameron asked Buether what she was supposed to do without any belongings. Buether told her to "do what you need to do."

On October 9, 2008, Cameron moved into a friend's house. A few days later, she used Buether's credit card to purchase furniture and housewares for her new residence. In total, Cameron purchased nearly $9,000 worth of beds, tables, chairs, and other furnishings from Overstock.com for herself and her (and Buether's) children.

Toward the end of October 2008, Buether rescinded the restraining order against Cameron, and the couple's children began splitting time between their parents. The couple also entered mediation in the hope of resolving child custody issues. While mediation was ongoing, Buether attempted to reconcile with Cameron, and spent the night at Cameron's residence on two occasions. Commenting on the new furniture, Buether told Cameron that once the couple got back together, they would sell all of the duplicative items on eBay.

Cameron, however, refused to reconcile with Buether. Buether, individually and through his lawyer, then demanded that Cameron repay him for the furniture. Cameron refused.

On November 14, 2008, Buether filed a criminal complaint with the San Diego County Sheriff's Department, claiming that an "unknown suspect" had used his credit card without authorization to purchase items from Overstock.com. Buether told the sheriffs that he thought Cameron might be responsible for the disputed transactions. Buether further indicated that he wanted to press charges should a suspect be apprehended.

San Diego County Sheriff's Detective Michelle Craig was assigned to investigate Buether's claims. Craig and Buether had attended the Sheriff's Academy together, and had worked on the same shift at the Vista Patrol Station for four years. During that time, Craig and Buether responded to hundreds of calls together, and Cameron alleges that Craig and Buether were friends. Both Craig and Buether insist they did not maintain a social relationship outside of work.

On November 17, 2008, Craig began investigating Buether's claims. First, Craig called Overstock.com, which confirmed that it shipped the disputed items to Cameron at her new address, and that Buether's credit card was used for payment. Second, Craig interviewed Buether. Buether informed Craig that he and Cameron had lived together for four years, that Cameron had recently moved out because she was violent and unstable, and that he had seen some new furniture and furniture boxes at Cameron's residence when he visited her there. Buether also informed Craig that while he had given Cameron permission to use his credit card in the past, he had always been present when the credit card was used, and that he did not give Cameron permission to make these specific purchases. Finally, Buether told Craig that he had confronted Cameron about the disputed credit card charges during one of the couple's custody mediation sessions. Buether told Craig that Cameron responded, "Oh, you mean our joint credit card," and then promptly changed the subject. Craig then showed Buether pictures of some of the items that had been charged to Buether's credit card, and Buether confirmed he had seen similar items inside Cameron's home.

On December 15, 2008, Craig applied for a warrant to search Cameron's apartment for the purchased items. Craig's supporting affidavit read, in relevant part, as follows:

> Michelle Cameron and the victim began dating and living together approximately four years ago. They have had two children together, but were never married. Their relationship deteriorated and in September 2008 there was an unreported domestic violence incident . . . On 10/08/08, the victim obtained a restraining order against Michelle which also ordered her out of the residence . . . The victim later rescinded the restraining order, which is no longer valid. On 10/13/08, Michelle Cameron placed three different internet orders on Overstock.com purchasing items totaling $8,969.39. Michelle used US Bank Visa credit card number [] to pay for the purchases. That credit card belongs solely to the victim, her ex-boyfriend, who did not authorize the transactions. Invoices obtained from Overstock.com during this investigation document the shipping address, phone number, and e-mail addresses, which all belong to Michelle Cameron. I showed the victim photos of possible items purchased by Michelle, and he stated he has seen the following stolen items inside her residence as of 3 to 4 weeks ago [] . . . Based on my training and experience and the above investigation, I believe there is a substantial likelihood that stolen property will be present when I execute this warrant because Michelle

> Cameron purchased those items in order to
> furnish her new home after being ordered out
> of her prior residence and some of the items,
> such as beds, are being used for her and her
> children to sleep on.

A deputy district attorney reviewed the warrant affidavit, and certified his belief that it was legally sufficient. A San Diego County Superior Court judge issued the warrant that same day.

Soon after the search warrant issued, Buether provided Craig with his custody schedule. One of the days Buether indicated Cameron would have custody of the couple's children was December 18, 2008. Craig asked whether Buether would be available to pick up his children if Cameron were arrested. Buether indicated that he could pick up the children at any time.

Craig also conducted background checks on all of the known residents of Cameron's apartment. Craig uncovered no information indicating that any of the residents would be armed, and had no reason to suspect that Cameron or any other resident might pose a threat to officer safety. However, Craig was unable to complete a background check on one suspected resident.

At 7:00 a.m. on December 18, 2008—a time Craig knew Cameron would have custody of her two young children—Craig and six to ten other San Diego County Sheriff's Deputies executed the search warrant at Cameron's

residence.[3]  Upon arrival, the deputies knocked, announced themselves, and demanded entry.  One of Cameron's roommates admitted the deputies.  The deputies were armed and had their weapons drawn.  They were dressed entirely in black, with bulletproof vests and helmets.  The deputies went upstairs, where they encountered Cameron in a hallway outside her bedroom.  Multiple deputies aimed their weapons at Cameron, who was trying to alert the officers to the presence of her children in an adjacent bedroom.  Cameron repeatedly implored the deputies not to scare her small children, and pointed toward the children's bedroom.  In response, the deputies grabbed Cameron by the arms and shoulders and pushed her in the back to force her out of the hallway.[4]  The deputies pushed Cameron into the living room, where her arms were pulled behind her back and she was handcuffed.  Cameron testified that the handcuffs were applied tightly enough to leave a bruise that lasted for a few days.  Cameron was then seated on a couch while the Sheriff's Deputies conducted their search.

In the meantime, Craig phoned Buether to come and pick up the children, which Buether did shortly thereafter.  Craig then interviewed Cameron, who explained that she believed she was an authorized user on Buether's credit card, that she had used his credit card frequently in the past, and that she thought Buether had given her permission to use the credit

---

[3] Cal. Penal Code § 1533 dictates that 7:00 a.m. is the earliest a search warrant can be executed without obtaining a judge's special permission for night service.  *See also Rodriguez v. Superior Court*, 245 Cal. Rptr. 617, 624–25 (Ct. App. 1988) (describing the heightened standard for obtaining nighttime service of a search warrant).

[4] At her deposition, Cameron likened the experience to being "in a tumbler."

card to purchase the disputed items. At the conclusion of the interview, Cameron was arrested for identity theft, grand and petty theft, and fraudulent use of an access card. She was transported to county jail. That same day, Buether called the mediator overseeing the couple's custody dispute to inform him that Cameron had been arrested. Cameron was released from jail five days later. The District Attorney declined to prosecute Cameron, and all charges were voluntarily dismissed.

## PROCEDURAL BACKGROUND

Cameron brought suit against Buether and the County Defendants on November 6, 2009.[5] Cameron complained that Buether and the County Defendants conspired to violate, and did violate, her Fourth and Fourteenth Amendment rights when they unlawfully searched her home pursuant to an invalid search warrant, used excessive force in the execution of that warrant, and arrested her without probable cause. Cameron also brought state law claims for negligence, harassment, false arrest, and violation of California Civil Code § 52.1.

After Cameron had twice amended her complaint, the County Defendants moved to dismiss Cameron's negligence claim.[6] The district court granted the County Defendants'

---

[5] Buether is not a party to this appeal. In the district court, Buether did not join any of the County Defendants' dispositive motions. Buether's own motion for judgment on the pleadings—filed after summary judgment had already been granted in favor of the County Defendants—was denied as moot.

[6] Cameron's Third Amended Complaint (the operative complaint) no longer contains a cause of action for harassment.

motion with prejudice. On November 18, 2010, the County Defendants moved for summary judgment with respect to Cameron's remaining claims. The County Defendants' motion was granted on March 4, 2011, and final judgment was entered on May 13, 2011. Cameron timely appeals.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review the district court's entry of judgment under 28 U.S.C. § 1291. We review a grant of summary judgment de novo, "and must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

## DISCUSSION

### I. Constitutionality of the Search

Cameron claims her home was unlawfully searched pursuant to an invalid search warrant. To be valid, a search warrant "must be supported by an affidavit establishing probable cause." *United States v. Stanert*, 762 F.2d 775, 778 (9th Cir. 1985). Probable cause exists where, under the totality of the circumstances, a reasonable officer has occasion to believe that the search will uncover evidence relating to a suspected crime. *See Illinois v. Gates*, 462 U.S. 213, 230–31 (1983); *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949). The test is an objective one, and the "actual motivations of the individual officers involved . . . play no role in" the Fourth Amendment analysis. *Whren v. United States*, 517 U.S. 806, 813 (1996).

The warrant to search Cameron's home issued on the basis of Detective Craig's affidavit. Our review of that affidavit confirms what the issuing judge previously determined—that the totality of the circumstances described therein provided probable cause to search Cameron's residence. Among other crimes, Cameron was suspected of fraudulently using Buether's credit card to obtain valuable property. *See* Cal. Penal Code § 484g (anyone who "obtains money, goods, services, or anything else of value by representing without the consent of the cardholder that he or she is the holder of an access card and the card has not in fact been issued, is guilty of theft"); *see also People v. Molina*, 15 Cal. Rptr. 3d. 493, 495–96 (Ct. App. 2004) (a credit card is an "access card" for the purposes of § 484). In her affidavit, Craig averred that Buether did not authorize Cameron to use his credit card and that Overstock.com confirmed that Buether's credit card was used to purchase items worth nearly $9,000. On their own, these statements were sufficient to establish probable cause to suspect that Cameron had violated § 484g of the California Penal Code. Craig's further allegations—that Overstock.com shipped the purchased items to Cameron's home address, and that Buether saw what he believed to be at least some of the purchased items inside Cameron's home—were sufficient to establish probable cause to search Cameron's home for evidence of her suspected crime(s). Thus, the search warrant was facially valid.

Cameron advances two alternative theories to explain why the search, despite being conducted pursuant to a facially valid warrant, nevertheless violated her constitutional rights. First, Cameron argues that the search was unconstitutional because Craig had a duty to investigate Cameron's version of events before obtaining the search warrant. If Craig had

learned Cameron's version of events (i.e., that Cameron believed she was authorized to use Buether's credit card), and had included that story in the warrant application, Cameron claims the search warrant would never have issued. We cannot credit this argument. The fact that a suspect denies an essential element of a crime does not automatically negate probable cause. While best practices may dictate that the police obtain both sides of a story where practicable, the law simply does not mandate such diligence.[7] Once probable cause is established, "an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003) (citation and quotations omitted).

Second, Cameron argues that Craig intentionally excluded relevant information from her affidavit, such as Craig's working relationship with Buether, Buether and Cameron's ongoing custody dispute, and the extent of Buether and Cameron's financial intermingling. It is well established that a police officer may not deliberately omit facts that would otherwise negate a showing of probable cause. *See Franks v. Delaware*, 438 U.S. 154, 171–72 (1978).

Unfortunately for Cameron, these are not such facts. Even if the omitted material had been included, the warrant would still be supported by probable cause. *See id.* at 155–56 (explaining that to establish a Fourth Amendment violation, an alleged omission must be "*necessary* to the finding of probable cause") (emphasis added); *see also United States v.*

---

[7] Cameron's police practices expert, who was formerly the commanding officer of the San Diego County Sheriff's Department Internal Affairs Unit, testified at his deposition that it was "neglect of duty" for Craig not to interview Cameron before obtaining the search warrant.

*Martinez-Garcia*, 397 F.3d 1205, 1214 (9th Cir. 2005). By way of example, even had the affidavit referenced Cameron's prior authorized use of Buether's credit card, it would not necessarily undercut Buether's claim that Cameron was not authorized to use his credit card for *these specific purchases*—purchases the merchant confirmed were made by Cameron. Put differently, the facts "necessary to the finding of probable cause" were the ones contained in the warrant affidavit, not those omitted by Craig. Because the search of Cameron's home did not violate her Fourth Amendment rights, the district court properly awarded summary judgment to the County Defendants on these claims.[8]

## II. Constitutionality of the Arrest

Cameron also claims the County Defendants lacked probable cause to arrest her. Largely for the reasons explained above, Part I, *supra*, we disagree.

When Cameron was arrested, Craig knew at least the following: (1) Buether claimed that Cameron used his credit card without authorization; (2) Overstock.com confirmed that Cameron used Buether's credit card; (3) items purchased from Overstock.com were present in Cameron's home; and (4) Cameron claimed that she had frequently used Buether's credit card in the past, and thought she had permission to use Buether's credit card to make the relevant purchases. At

---

[8] It is important to note that by rejecting Cameron's search claims, the panel in no way endorses Craig's or Buether's conduct here. Craig's failure to include clearly relevant—albeit legally "unnecessary"—details in the search warrant affidavit demonstrates, at the very least, a significant lack of professional judgment. At worst, it is evidence of a purposeful attempt to aide Buether in his alleged vendetta against Cameron. *See* Part IV, *infra*.

bottom, Craig was faced with a classic "he said, she said" situation: Buether claimed Cameron didn't have his permission to use his credit card, while Cameron claimed that she did. Under the totality of these circumstances, an objectively reasonable officer could have chosen to believe Buether. Consequently, we cannot conclude that Cameron was arrested without probable cause. The district court properly ruled in favor of the County Defendants on Cameron's false arrest claims.

## III.    Constitutionality of the Use of Force

Cameron also brings claims regarding the amount of force the County Defendants used to execute the search warrant and Cameron's arrest. Cameron alleges that the County Defendants used "SWAT-like" tactics in order to intimidate her, and that a jury could find that the level of force employed was constitutionally excessive. The County Defendants asserted that the amount of force used was reasonable and that Craig is entitled to qualified immunity because no clearly established law put her on notice that the force employed was excessive. Because "historical facts material to the qualified immunity determination are in dispute," *Connor v. Heiman*, 672 F.3d 1126, 1131 (9th Cir. 2012) (internal quotation marks omitted), the district court erred in granting summary judgment to the defendants on the excessive force claim.

"[T]he Supreme Court set forth a two-part test for qualified immunity in excessive force cases. First, we examine whether a Fourth Amendment violation occurred; second, we look to see whether the officers violated clearly established law." *Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Court held

that lower courts may address the second step alone where it proves dispositive.

It is clearly established that "[t]he Fourth Amendment proscribes only 'unreasonable' searches and seizures." *Franklin v. Foxworth*, 31 F.3d 873, 875 (9th Cir. 1994). The reasonableness of a search or seizure depends "not only on *when* [it] is made, but also *how* it is carried out." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (emphasis added). "In other words, even when supported by probable cause, a search or seizure may be invalid if carried out in an unreasonable fashion." *Franklin*, 31 F.3d at 875 (emphasis omitted).

We have repeatedly counseled that the reasonableness of a particular search or seizure must be "assessed by carefully considering the objective facts and circumstances that confronted the [involved] officer or officers." *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). While a court (or jury) may "look to whatever specific factors may be appropriate in a particular case," *Franklin*, 31 F.3d at 876, the Supreme Court has articulated three factors that courts should typically consider: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. Crucially, "[b]ecause questions of reasonableness are not well-suited to precise legal determination, the propriety of a particular use of force is generally an issue for the jury." *Chew*, 27 F.3d at 1440 (citations omitted); *see also Coles v. Eagle*, 704 F.3d 624, 628 (9th Cir. 2012). "[I]n excessive force cases . . . in addition to the deference officers receive on the underlying constitutional claim, qualified immunity can apply in the

event [a] mistaken belief [about the amount of force required] was reasonable." *Saucier*, 533 U.S. at 206.

The factual record on the excessive force claim is not fully developed. The parties, for example, agree that the deputies entered Cameron's residence with guns drawn, but dispute whether deputies pointed their guns at Cameron's head. Although Cameron conceded that Craig is not personally liable for her deputies pointing guns at Cameron's head, Cameron asserted at oral argument that Craig is liable for directly participating in the raid and in organizing it to take place at such a time and in such a manner as to be maximally intimidating. "[W]hen the disputed facts and inferences are treated in the manner required by law," that is, construed in Cameron's favor, "a jury could properly find that the force used [was] greater than was reasonable under the circumstances." *Tekle v. United States*, 511 F.3d 839, 846 (9th Cir. 2007) (internal quotation marks omitted and second alteration in original). Cameron's suspected crimes were relatively minor and non-violent,[9] the County Defendants had no reason to suspect Cameron or any of her known roommates would pose a threat to officer safety, and

---

[9] That Cameron was suspected of relatively minor property crimes significantly undercuts the County Defendants' arguments that the level of force used here was *per se* reasonable. A rational jury could easily determine that the deployment of up to ten heavily armed officers is unnecessary to execute a search warrant looking for stolen property. This is particularly true where, as here, there is no concern that the property might be moved or destroyed in the time it takes to secure the scene. Unlike drug seizures, for instance, where a quick entry requiring multiple officers may be desirable to prevent the destruction of evidence, *see, e.g.*, *Illinois v. McArthur*, 531 U.S. 326, 332 (2001), the property at issue here included a six-drawer dresser and a mattress.

Cameron was not resisting arrest. The County Defendants presented no evidence to the contrary.

Nevertheless, Craig led six to ten Sheriff's Deputies into Cameron's residence with guns drawn early in the morning. Those deputies pointed weapons at Cameron, grabbed Cameron by the arms and shoulders, pushed her in the back down a hallway, and then tightly handcuffed her. On this view of the facts, a reasonable jury could find that the deputies used excessive force. *See, e.g.*, *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1013–15 (9th Cir. 2002) (en banc) (aiming weapons at a suspect may, in certain circumstances, constitute excessive force); *Baldwin v. Placer Cnty.*, 418 F.3d 966, 970 (9th Cir. 2005) (pointing weapons and pushing plaintiff could constitute excessive force); *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000) (tight handcuffing can constitute excessive force); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) ("[P]olice officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever.").

The County Defendants' arguments to the contrary are not persuasive. For instance, the County Defendants argue that Craig was unable to ascertain the identity—and consequently the risk profile—of one of Cameron's roommates before conducting the search. Thus, the County Defendants argue that Craig and her colleagues took reasonable precautions to protect themselves against an "unknown threat." Perhaps, but that determination is for a jury to make, not us. Our only task is to determine whether the evidence presented "permits only one reasonable conclusion"—that the County Defendants did not use excessive force. *Santos*, 287 F.3d at 851. That is simply not the case here.

The County Defendants are not entitled to qualified immunity at this juncture as the record does not permit us to decide whether they violated clearly established law. "[W]hether the officers may be said to have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the inferences it draws therefrom." *Id.* at 855 n.12. And apart from the question of qualified immunity on the federal claims, Cameron is entitled to jury trial on her claim for excessive force under California Civil Code § 52.1, which permits civil actions for interference with rights under the United States or California Constitutions by threats, intimidation, or coercion. *See Cousins v. Lockyer*, 568 F.3d 1063, 1072 (9th Cir. 2009) (quoting *Venegas v. Cnty. of L.A.*, 63 Cal. Rptr. 3d 741, 751 (Ct. App. 2007)) ("California law is clear that '[t]he doctrine of qualified governmental immunity is a federal doctrine that does not extend to state tort claims against government employees.'"). Cameron asserts no California right different from the rights guaranteed under the Fourth Amendment, so the elements of the excessive force claim under § 52.1 are the same as under § 1983. *See Reynolds v. Cnty. of San Diego*, 84 F.3d 1162, 1170 (9th Cir.1996), *overruled on other grounds*, *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997) ("Section 52.1 does not provide any substantive protections; instead, it enables individuals to sue for damages as a result of constitutional violations.").

## IV.    Conspiracy

Cameron also brings a conspiracy claim. "Conspiracy to violate a citizen's rights under the Fourth Amendment . . . is evidently as much a violation of an established constitutional right as the [underlying constitutional violation] itself." *Baldwin*, 418 F.3d at 971. Cameron alleged that Craig and

Buether conspired to obtain an invalid search warrant. Because we conclude the search warrant was valid, there can be no claim for conspiracy on this ground. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012) (en banc) (recognizing that conspiracy "does not enlarge the nature of the claims asserted by the plaintiff, as there must always be an underlying constitutional violation"). But Cameron also alleged that Craig and Buether conspired regarding the timing and execution of the search. The summary judgment record reflects further facts regarding Buether's potential involvement in Craig's decisions regarding the manner of the search. The district court addressed and rejected the conspiracy claim only with regard to the allegation that Craig omitted relevant information from her search warrant affidavit. We conclude that Cameron is entitled to jury trial on the claim for conspiracy to use excessive force.

Cameron claims that the search warrant was executed in such a way as to intimidate her, and to secure an unfair advantage for Buether in the couple's custody proceedings. Viewing the evidence in the light most favorable to Cameron, and drawing all reasonable inferences therefrom, we conclude that Cameron's conspiracy claim should go to the jury. A rational jury could conclude that Craig and Buether conspired to abuse their power as law enforcement officers to deprive Cameron of her constitutional rights based on the evidence in the record that: Craig and Buether were friends and close colleagues; Craig knew Buether and Cameron were engaged in mediation over custody of their children; Craig purposefully chose to "raid" Cameron's home on a day when she knew Cameron's children would be present; the level of force used by Craig and the other County Defendants was clearly intimidating; and Buether sought to exploit the raid by immediately calling the couple's mediator after Cameron was

arrested.  Cameron is entitled to an opportunity to prove these serious allegations at trial.

## V.  Municipal Liability

Finally, we address the County's potential liability for the complained of acts of excessive force.  Under federal law, the County cannot be held vicariously liable for its deputies' acts of excessive force.  The County may be held liable only if it "has adopted an illegal or unconstitutional policy or custom" that resulted in the excessive force.  *Robinson*, 278 F.3d at 1016 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)).  Cameron has not identified any custom or policy of the County that guided the deputies' use of force in the search and arrest.  The County is therefore entitled to summary judgment on the § 1983 claim.

The result is different with regards to Cameron's state law claim for excessive force under California Civil Code § 52.1. Because California has rejected the *Monell* rule, *see* Cal. Gov't Code § 815.2, state law "imposes liability on counties under the doctrine of respondeat superior for acts of county employees; it grants immunity to counties only where the public employee would also be immune."  *Robinson*, 278 F.3d at 1016.  The defendants do not raise any state statutory immunities.  Thus, should Cameron prevail on her excessive force claim, liability could extend to the County.

## CONCLUSION

The district court properly granted summary judgment on Cameron's unlawful search and arrest claims.  But disputed issues of material fact preclude an award of summary judgment on Cameron's excessive force and conspiracy

claims.  We therefore remand those portions of Cameron's case to the district court for proceedings consistent with this opinion.

We award the costs of this appeal to Cameron.  Fed. R. App. P. 39(a)(4).

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**