FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SARA LOWRY,
  *Plaintiff-Appellant*,

v.

CITY OF SAN DIEGO,
  *Defendant-Appellee.*

No. 13-56141

D.C. No.
3:11-cv-00946-MMA-WMC

OPINION

Appeal from the United States District Court
for the Southern District of California
Michael M. Anello, District Judge, Presiding

Argued and Submitted
July 9, 2015—Pasadena, California

Filed April 1, 2016

Before: Stephen Reinhardt, A. Wallace Tashima,
and Richard R. Clifton, Circuit Judges.

Opinion by Judge Tashima;
Dissent by Judge Clifton

**SUMMARY**\*

**Civil Rights**

The panel reversed the district court's summary judgment and remanded in an action brought pursuant to 42 U.S.C. § 1983 alleging that the City of San Diego's policy of training its police dogs to "bite and hold" individuals resulted in a violation of plaintiff's Fourth Amendment rights.

The panel held that  a reasonable jury could find that police officers responding to an office building's burglar alarm used excessive force when they deliberately unleashed a police dog that they knew might well "rip[] [the] face off" any individual who might be present in the office.  Because a reasonable jury could find that the force used was excessive and because the City conceded that the use of the force involved was in conformance with its policy, the panel reversed the district court's summary judgment in favor of the City and remanded for further proceedings.

Dissenting, Judge Clifton stated that given the facts available to the reviewing court, it was clear that the type and amount of force inflicted was moderate, that the City had a strong interest in using force, and that the degree of force used was commensurate with the City's interest in the use of force.  Judge Clifton stated that the officers' actions were constitutional, and there could be no liability under *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978).

---

\* This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Jeffrey A. Lake (argued), Nathan A. Shaman (argued), Jeffrey A. Lake, A.P.C., San Diego, California, for Plaintiff-Appellant.

Jan I. Goldsmith, City Attorney of San Diego, Daniel F. Bamberg, Assistant City Attorney, Stacy J. Plotkin-Wolff, Deputy City Attorney (argued), San Diego, California, for Defendant-Appellee.

**OPINION**

TASHIMA, Circuit Judge:

After a night of drinking with her friends, Sara Lowry returned to her workplace and fell asleep on her office couch. She awoke a short while later and went to the bathroom, before returning to her couch and going back to sleep. Unfortunately for Lowry, during her trip to the bathroom, she accidentally triggered the building's burglar alarm. Several officers from the San Diego Police Department ("SDPD") responded, accompanied by a police service dog named Bak. After searching the area and giving several warnings, the officers released Bak into Lowry's office. Bak found Lowry and pounced on her, tearing open her upper lip.

Lowry filed suit against the City of San Diego (the "City") under 42 U.S.C. § 1983, alleging that the City's policy of training its police dogs to "bite and hold" individuals resulted in a violation of her Fourth Amendment rights. The district court granted the City's motion for summary judgment, concluding both that Lowry did not

suffer constitutional harm and that, even if she did, the City was not liable for her injuries.

We have jurisdiction under 28 U.S.C. § 1291. The question on this appeal is whether a reasonable jury could find that the police officers responding to the alarm used excessive force when they deliberately unleashed a police dog that they knew might well "rip[] [the] face off" any individual who might be present in the office. Because a reasonable jury could find that the force used was excessive and because the City concedes that the use of the force involved was in conformance with its policy, we reverse and remand the case for further proceedings.

## I.

In early 2010, Lowry was working at Tenzing Corporation, located at 4603 Mission Boulevard, Suite 201, in San Diego, California. On the night of February 11, 2010, Lowry went out with a few friends after work. Over the course of about four and a half hours, Lowry visited two bars and consumed five vodka drinks. Lowry decided to call it a night at around 9:30 p.m., but, instead of heading home, made a pit stop at work to pick up some food she had left over from lunch. Once there, Lowry decided to stay in the office, and fell asleep on the couch.

Shortly thereafter, Lowry woke up and went to use the bathroom. Acting on instinct, Lowry headed towards the bathroom in the neighboring suite (owned by a separate company, Drew George & Partners or "DGP"), the bathroom she typically used during business hours. After opening the door to DGP, Lowry decided against using their bathroom, concluding that "it wouldn't be right for [her] to use that

restroom at night." She closed the door, went to a bathroom outside both suites that was open to the public and then returned to her office and fell back asleep on the couch.

Around 11:00 p.m., the SDPD received a call from ADT Security Services that a burglar alarm had been activated at 4603 Mission Boulevard, Suite 200. Minutes later, Officers Mike Fish and David Zelenka and Sergeant Bill Nulton arrived at the scene, accompanied by Sergeant Nulton's police service dog, Bak. The officers inspected the north, south, and west sides of the building and saw no entry points. However, each officer saw that the door leading to Suite 201 was propped open.[1] There were no signs of forced entry at Suite 201, which was dark, except for some ambient light shining through the open door from the parking lot.[2] The

---

[1] Lowry contends that a genuine issue of material fact exists as to whether the door leading to Suite 201 was open. Specifically, she argues that the officers' assertion that the door was open is contradicted by her deposition testimony that the door "automatically closes." The district court ruled Lowry's testimony inadmissible, finding that Lowry failed to offer "firsthand testimony." Accordingly, the district court ruled that there was no dispute that the door was open.

We reverse evidentiary rulings made in the context of summary judgments only if they are "both manifestly erroneous and prejudicial." *Bias v. Moynihan*, 508 F.3d 1212, 1224 (9th Cir. 2007) (citations omitted). As explained below, even assuming that the door to Suite 201 was open, a reasonable jury could find that deploying Bak was not an objectively reasonable use of force. Accordingly, because the district court's ruling was not prejudicial, we need not rule on it.

[2] Lowry contends that there is a material issue of fact regarding the level of illumination inside Suite 201 at the time the officers entered. Specifically, she relies on the testimony of Drew George (the CEO of DGP), who testified that the *balcony* is typically "pretty light." However, George offered no testimony as to how well-lit the interior of Suite 201

officers could not see inside the suite, and therefore did not know whether anyone was inside.

Before entering Suite 201, Sergeant Nulton yelled loudly, "This is the San Diego Police Department! Come out now or I'm sending in a police dog! You may be bitten!" Sergeant Nulton waited between 30 and 60 seconds, but received no response. He repeated the same warning once or twice more; again, there was no response.[3] Lowry did not hear these warnings. Sergeant Nulton then released Bak "off lead" (that is, off of her leash) into the suite, and followed Bak in. Sergeant Nulton did not keep track of Bak's precise location once he let her off lead, and gave no further warnings after entering the suite.

Eventually, Sergeant Nulton made his way into the office where Lowry was sleeping. Once there, he saw a purse

was on the night of the incident, and Lowry herself testified that, on that night, Suite 201 was dark. Accordingly, we conclude that Lowry has not raised a genuine issue of material fact regarding the degree of illumination inside Suite 201.

[3] Lowry contends that there is an issue of material fact as to whether Sergeant Nulton gave these warnings. Specifically, she argues that the officers' testimony is contradicted by her own testimony that she did not hear Sergeant Nulton's warnings. The district court ruled Lowry's testimony on this point inadmissible, finding that she lacked foundation to testify as to whether Sergeant Nulton gave warnings because she was sleeping. Therefore, the district court ruled that it was undisputed that Sergeant Nulton gave these warnings.

As explained below, even assuming that Sergeant Nulton shouted warnings that he was about to release a police dog, a reasonable jury could find that deploying Bak was not an objectively reasonable use of force. Accordingly, because the district court's ruling was not prejudicial, we need not rule on it. *See Bias*, 508 F.3d at 1224.

whose contents had been spilled across the floor. He then shone his flashlight against the office wall and spotted a person under a blanket on the couch. At that moment, Bak jumped on top of Lowry. The two struggled momentarily before Sergeant Nulton called Bak off. Bak responded immediately, returning to Sergeant Nulton's side.

Lowry emerged from her skirmish with Bak with a large gash on her lip that was bleeding profusely. As hospital staff would later inform Lowry, Bak had almost completely bitten through her lip. Shortly after the incident, Sergeant Nulton told Lowry, "I just can't believe that's the only damage. You're very lucky. She could have ripped your face off." After confirming that Lowry worked at Tenzing, Officer Fish drove her to the hospital, where she was given a tetanus shot and received three stitches.

The SDPD trains its police dogs to enter a building, find a person, bite them, and hold that bite until a police officer arrives and removes the dog. Moreover, as Sergeant Nulton stated in his deposition, police dogs are not trained to differentiate between "a young child asleep or . . . a burglar standing in the kitchen with a butcher knife," and will simply bite the first person they find. Generally, the decision of whether to conduct a canine search on or off lead is left to the officer's discretion. However, the SDPD's Canine Unit Operations Manual provides that residential searches "should normally be conducted on-lead unless the handler can reasonably determine there are no residents or animals in the home."

Lowry filed suit against the City under 42 U.S.C. § 1983, alleging a violation of her Fourth Amendment rights. The

City moved for summary judgment, which the district court granted.  Lowry timely appealed.

## II.

We review a district court's grant of summary judgment *de novo*.  *Pac. Shore Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1156 (9th Cir. 2013).  "We must determine, viewing the evidence in the light most favorable to [Lowry], the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law."  *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).  In the absence of material factual disputes, the objective reasonableness of a police officer's conduct is "a pure question of law."  *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)).  "Where the objective reasonableness of an officer's conduct turns on disputed issues of material fact," however, "it is 'a question of fact best resolved by a jury.'" *Id.* at 1123 (quoting *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003)).

## III.

Lowry asserts a single cause of action against the City, seeking to hold the municipality liable for her injuries under *Monell v. Department of Social Services  of the City of New York*, 436 U.S. 658 (1978).  Specifically, Lowry alleges that the City's "bite and hold" policy caused the police to use excessive force against her.  In order to prevail on a *Monell* claim, Lowry "must demonstrate first that h[er] seizure by [Bak] was unconstitutional and second that the city was

responsible for that constitutional wrong." *Chew v. Gates*, 27 F.3d 1432, 1439 (9th Cir. 1994).

## A.  Excessive Force

We begin our analysis of Lowry's *Monell* claim by assessing whether Bak's seizure of Lowry was unconstitutional.  Objectively unreasonable uses of force violate the Fourth Amendment's guarantee against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394–95, 397 (1989).  In deciding whether or not a particular use of force is reasonable, we employ the familiar test set forth by the Supreme Court in *Graham*.  Under *Graham*, we balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396 (citations omitted).  This inquiry is a "highly fact-intensive task for which there are no per se rules." *Torres*, 648 F.3d at 1124 (citing *Scott*, 550 U.S. at 383).  However, we must evaluate the reasonableness of the force used "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (citation omitted).

Our excessive force analysis under *Graham* involves three steps.  "First, we must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." *Glenn v. Washington Cty.*, 673 F.3d 864, 871 (9th Cir. 2011) (citation omitted).  "Second, we evaluate the government's interest in the use of force." *Id.*  "Finally, we balance the gravity of the

intrusion on the individual against the government's need for that intrusion." *Id.* (citation omitted).

### 1.  The Nature and Quality of the Intrusion

In evaluating the severity of the intrusion on the plaintiff's Fourth Amendment rights, we evaluate both "the type and amount of force inflicted." *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003); *see also Headwaters Forest Def. v. Cty. of Humboldt*, 240 F.3d 1185, 1198 (9th Cir. 2000), *vacated and remanded on other grounds sub nom. Cty. of Humboldt v. Headwaters Forest Def.*, 534 U.S. 801 (2001) ("[T]he fact finder [must] evaluate 'the type and amount of force inflicted.'" (quoting *Chew*, 27 F.3d at 1440)). We have repeatedly held that deploying a police dog to effectuate an arrest is a "severe" use of force. *See Smith v. City of Hemet*, 394 F.3d 689, 701–02 (9th Cir. 2005) (en banc) (noting that use of a police dog is "the most severe force authorized short of deadly force"); *Chew*, 27 F.3d at 1441 (holding that the use of a police dog was a "severe" use of force); *see also Miller*, 340 F.3d at 964 (concluding that use of a police dog was a "serious" intrusion on the plaintiff's Fourth Amendment interests).

Notwithstanding our precedents, the district court found the force used against Lowry to be "moderate," because Bak's encounter with Lowry was "very quick" and because Lowry's injuries were "slight." In coming to its conclusion, the district court distinguished our decision in *Chew*, emphasizing that, in that case, the police dog bit the plaintiff several times, dragged him between four and ten feet, and nearly severed his arm. *Chew*, 27 F.3d at 1435, 1441. By contrast, the district court noted, Lowry's struggle with Bak

was of "limited duration" and her injuries were relatively minor.

By focusing solely on the *amount* of force used against Lowry, the district court overlooked a critical component of our inquiry under *Graham*'s first step. Namely, the district court failed to consider the *type* of force employed. Our precedents, as well as the Supreme Court's, make clear that, in evaluating the severity of the intrusion on a plaintiff's Fourth Amendment rights, we must assess not only the *amount* of force used (and the severity of the resulting injury), but also *type* of force used and the *potential* harm it may cause. *See Miller*, 340 F.3d at 964 ("[W]e assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating *the type and the amount of force inflicted*." (emphasis added)); *see also Scott*, 550 U.S. at 383 ("[I]n judging whether [Deputy] Scott's actions were reasonable, we must consider the *risk* of bodily harm that Scott's actions posed to respondent in light of the threat to the public that Scott was trying to eliminate." (emphasis added)); *Glenn*, 673 F.3d at 871–72 (holding that the use of a beanbag shotgun is "permissible only when a strong governmental interest compels the employment of such force" in "light of this weapon's *dangerous capabilities*" (citation omitted) (emphasis added)); *Chew*, 27 F.3d at 1441 (concluding that the force used was severe both because of the nature of injuries sustained and because the dog was trained to repeatedly bite a suspect if he or she resisted and because of the undisputed testimony that the dog's bites "*could* be fatal" (emphasis added)).

To put it differently, looking solely to the actual consequences of the force used rather than the risk inherent in the use of that type of force accommodates one of the two

purposes of § 1983 but wholly ignores the other. Those two purposes are compensation *and deterrence. Chaudhry v. City of L.A.*, 751 F.3d 1096, 1103 (9th Cir. 2014) (citing *Robertson v. Wegmann*, 436 U.S. 584, 599 (1978)). For example, if a police officer fires a gun at a fleeing misdemeanor suspect but the bullet only grazes the suspect's leg, we would not dismiss the force as non-severe because the bullet did not do the damage that it foreseeably could have done. *See Robinson v. Solano Cnty.*, 278 F.3d 1007, 1014 (9th Cir. 2002) (holding that police officers' pointing their guns at close range at a suspect was excessive force even though they did not fire the gun). Likewise, in this case we must not rely on the plaintiff's "luck" that she only ended up bleeding profusely from a cut lip rather than having her whole face "ripped off" to excuse the conduct that the officer himself recognized could well have resulted in a far more egregious injury. Indeed, the officer conducting the search stated that he "just can't believe [that] the only damage" was Lowry's gash on her lip; as he put it, she was "very lucky." Whether or not the plaintiff in the case ended up being lucky, a fundamental purpose of § 1983 is to deter the use of unreasonable force in the future in order to avoid what could be much more serious harm to the next person.

When we consider both the type and the amount of force used against Lowry and draw all inferences in her favor, we have little trouble concluding that the intrusion on Lowry's Fourth Amendment rights was severe. Indeed, this case mirrors *Chew* in several material respects: just as the defendants in *Chew* admitted that the dog's bites "could be fatal," 27 F.3d at 1441, here, Sergeant Nulton stated that Bak "could have ripped [Lowry's] face off." And, just like the dog in *Chew*, Bak was trained to bite the first person she saw and maintain the bite until ordered by an officer to release.

Moreover, the particular facts of this case magnified the threat that Bak posed to Lowry: as Sergeant Nulton admitted, Bak was not trained to differentiate between "a young child asleep or . . . a burglar standing in the kitchen with a butcher knife," and would simply bite the first person she found. Furthermore, a reasonable juror could find that by allowing Bak to enter Suite 201 before him off lead, and by failing to keep track of Bak's precise location while searching the suite, Sergeant Nulton increased the likelihood that Bak would bite and seriously injure Lowry before being called off.

Under these circumstances, a reasonable juror could conclude that releasing Bak into the suite posed a high risk of severe harm to any individual present. Accordingly, for purposes of summary judgment, this factor weighs in favor of a finding that Lowry's constitutional rights were violated.

## 2. The City's Countervailing Interests

*Graham*'s second step requires us to examine the importance and legitimacy of the City's countervailing interests. *Miller*, 340 F.3d at 964. This determination is guided by three factors: "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Graham*, 490 U.S. at 396). These factors are not exclusive; instead, we must "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Glenn*, 673 F.3d at 872 (citations omitted).

### a. Lowry Did Not Pose a Threat to the Officers or Others

We begin our evaluation of the City's interest in deploying Bak off lead by analyzing the "most important single element of the three specified factors: whether the suspect pose[d] an immediate threat to the safety of the officers or others." *Smith*, 394 F.3d at 702 (quoting *Chew*, 27 F.3d at 1441). "A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). A reasonable jury could find that any belief on the officers' part that they faced an immediate threat when they released Bak was unjustified. *See Torres*, 648 F.3d at 1126 (holding that there was a genuine dispute of material fact whether an officer correctly evaluated the dangerousness of the situation when deciding to use force). Thus, viewing the evidence in the light most favorable to Lowry, the City has failed to show that there are no questions of fact precluding summary judgment in its favor.

Our case law helps guide this determination. In *Chew*, we held that "a rational jury could easily find that Chew posed no immediate safety threat to anyone." 27 F.3d at 1442 (emphasis omitted). Chew had been stopped for a traffic violation and then fled on foot and hid in a scrapyard. *Id.* at 1436. However, there was no evidence that Chew had "engaged in any threatening behavior during this time, or that he did anything other than hide quietly." *Id.* at 1441. Accordingly, we concluded that the "record d[id] not reveal an articulable basis for believing that Chew was armed or that he posed an immediate threat to anyone's safety." *Id.*

By contrast, in *Miller*, we held that the plaintiff "posed an immediate threat to [the] officers' safety." *Miller*, 340 F.3d at 965–66. There, the officer was chasing a felony suspect who (1) was wanted for fleeing from the police by driving a car with "a wanton or willful disregard for the lives . . . of others," (2) had possessed a large knife only moments earlier, (3) might have had mental health problems, (4) had ignored an officer's warning that he was about to release a dog, and (5) was familiar with the woods where he was hiding in the dark and might have been planning an ambush. *Id.* at 965 (citation omitted). Under these circumstances, we concluded that the officer was "entitled to assume that Miller posed an immediate threat" to their safety. *Id.*

Applying these precedents, we conclude that a reasonable jury could find that the officers would not have been justified in believing that Lowry posed a threat to their safety or to others'. Throughout the entire encounter, until she was bitten by Bak, Lowry remained fast asleep on the couch. Much like the plaintiff in *Chew*, Lowry did not "engage[] in any threatening behavior," nor do "anything other than [lie] quietly." 27 F.3d at 1441. And, unlike the plaintiff in *Miller*, the officers in this case had no reason to believe that Lowry was armed, dangerous, or intent on inflicting harm. 340 F.3d at 965. In short, "[t]he record does not reveal an articulable basis for believing that [Lowry] was armed or that [s]he posed an immediate threat to anyone's safety." *Chew*, 27 F.3d at 1441.[4]

---

[4] The City attempts to distinguish *Chew* by arguing that, unlike Sergeant Nulton, the officer in *Chew* made physical contact with Chew before releasing the police dog. According to the City, the officer's contact with Chew gave him an opportunity to eliminate the possibility that Chew was armed – a luxury not afforded to Sergeant Nulton.

The district court found otherwise, reasoning that the "officers reasonably and objectively feared for their own safety and any possible hostage's safety," because they were searching for a "burglary suspect . . . at night," because they "did not know whether the suspect was armed," and because the door to DGP's suite was "ajar, but no lights were on inside."**[5]**

A reasonable jury could easily disagree with this portrayal. The district court's reasoning assumes that any person inside an office building where a security alarm has been tripped at night necessarily poses an immediate threat to their safety or that of others. We find this assumption unwarranted.**[6]** These facts, standing alone, do not provide an

---

Not so. In *Chew*, we specifically noted that "[t]he officer [did] not search[] [Chew] for weapons" before he fled. 27 F.3d at 1436. More to the point, our conclusion that Chew did not pose a threat to the safety of the officers or others was grounded in our determination that the record as a whole "did not reveal an articulable basis for believing that Chew" presented such a threat. *Id.* at 1441. Likewise, as explained above, nothing in the record here provides an articulable basis for believing that Lowry posed a threat to the safety of the officers or others.

**[5]** Similarly, the City argues that, under our decision in *Frunz v. City of Tacoma*, officers responding to a "burglary in process" are entitled to "assume that the suspects will, if confronted, flee or offer armed resistance." 468 F.3d 1141, 1145 (9th Cir. 2006) However, *Frunz* did not address whether the officers' use of force was reasonable. *Id.* at 1144. Instead, that case considered only whether the officers' warrantless entry into a home was justified. *Id.* at 1144. Accordingly, *Frunz* has little relevance to our current inquiry.

**[6]** Indeed, this assumption is particularly suspect in light of the fact that the vast majority of burglar alarm calls are false. *See* San Diego County Grand Jury, *No 'Cost' For Alarm?* 1 (June 1, 2011), http://www.sandiegocounty.gov/content/dam/sdc/grandjury/reports/2010-

"articulable basis for believing that" the occupant is "armed or that [she or] he posed an immediate threat to anyone's safety." *Chew*, 27 F.3d at 1441.

In sum, we conclude that taking the facts in the light most favorable Lowry, a reasonable juror could conclude that the "objective factors" did not suggest that Lowry posed a threat to the safety of the officers or others. *Deorle*, 272 F.3d at 1281. Accordingly, for the purposes of summary judgment, this factor weighs against a finding that the City's interest rendered its use of force objectively reasonable.

### b. Lowry Did Not Resist or Attempt to Evade Arrest

Similarly, the third *Graham* factor – whether Lowry "actively resist[ed] arrest or attempt[ed] to evade arrest by flight," *Graham*, 490 U.S. at 396 – weighs against finding that the City's use of force was objectively reasonable. It is undisputed that Lowry did not physically resist arrest, "did not attack the officers" or anyone else, and did not attempt to flee from the officers. *Smith*, 394 F.3d at 703. Nonetheless, the district court found that this factor weighed slightly in the City's favor, reasoning that the officers could have construed Lowry's failure to respond to Sergeant Nulton's commands to exit the suite as an attempt to evade arrest.

But a reasonable jury would not necessarily be compelled to draw such an inference. The mere failure to respond to an officer's orders, without more, generally does not support the use of serious force – especially if the plaintiff has not heard

2011/AlarmsFinalReport.pdf (concluding that "95% or more of all police alarm calls" received by the SDPD are false).

the commands.  We concluded as much in *Glenn*, where we found that the plaintiff's failure to follow an officer's instructions to drop a pocketknife did not warrant the officers' use of a beanbag shotgun, because it was "not clear [that the suspect] heard or understood those orders." 673 F.3d at 875.  Indeed, even in cases where a plaintiff hears, and ignores, police warnings, we have found serious uses of force unjustified.  As we described in *Glenn*,

> In *Deorle*, the plaintiff "brandish[ed] a hatchet" and a crossbow and was verbally abusive to officers, threatening to "kick [their] ass." He also continually roamed about his property despite officers' orders. Nonetheless, we did not consider this sufficient active resistance to warrant use of the beanbag shotgun . . . . Similarly, in *Smith*, we held that the plaintiff's refusal to obey officers' commands to remove his hands from his pockets to show police whether he was armed, as well as his entry into his home despite officers' orders and his brief physical resistance were "not . . . particularly bellicose."

*Id.* (alterations in original) (citations omitted); *see also Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010) ("The only resistance Officer MacPherson testified to was a failure to comply with his order that Bryan remain in his car . . . . As in *Smith*, Bryan's 'resistance' was not 'particularly bellicose.'").  In short, where, as here, the "crux of the resistance [is] the refusal to follow officer's commands, rather than actively attacking or threatening officers or

others," the government has little interest in using serious force.  *Glenn*, 673 F.3d at 875.

Accordingly, for the purposes of summary judgment, we conclude that this factor weighs against a finding that the City's interest rendered its use of force objectively reasonable.

### c.  The Severity of the Crime at Issue

Turning to the final *Graham* factor, we conclude that the severity of the crime at issue – burglary – weighs only slightly in the City's favor.  Burglary is not an inherently dangerous crime.[7]  Although burglaries *can* be dangerous, *see Sykes v. United States*, 131 S. Ct. 2267, 2273 (2011), *overruled on other grounds by Johnson v. United States*, 135 S. Ct. 2551 (2015), the Supreme Court has explicitly held that "the fact that an unarmed suspect has broken into a dwelling at night does not automatically mean [s]he is physically dangerous." *Tennessee v. Garner*, 471 U.S. 1, 21 (1985).  Indeed, as the Supreme Court noted in *Garner*, the FBI classifies burglary as a "property" rather than a "violent" crime,[8] *id.*, and a recent study by the Bureau of Justice

---

[7] The City takes issue with this conclusion, arguing that all burglaries are dangerous.  In support of its contention, the City relies, once again, on our statement in *Frunz* that officers may assume that "normal[]" burglary suspects will, "if confronted, flee or offer armed resistance."  468 F.3d at 1145.  However, as explained above, *see supra* note 5, *Frunz* did not address whether the officers' use of force in that case was reasonable. *Id.* at 1144.  Accordingly, it has little bearing on the instant case.

[8] Although *Garner* was decided in 1985, the FBI continues to classify burglary as a "property" rather than a "violent" crime. *See* Federal Bureau of Investigation, Uniform Crime Reports, *Crime in the*

Statistics concluded that only about seven percent of burglaries nationwide involved incidents of violence. Bureau of Justice Statistics, *National Crime Victimization Survey: Victimization During Household Burglaries* 1 (September 2010), http://www.bjs.gov/content/pub/pdf/vdhb.pdf.

Once again, the district court came to the opposite conclusion, holding that, under *United States v. Alcala-Sanchez*, 666 F.3d 571, 573 (9th Cir. 2012), burglary is an "aggravated felony." Because the officers were investigating a felony, the district court reasoned, this factor "weighs solidly in favor of the government."

We disagree with this conclusion for two reasons. First, it misstates the law. In *Alcala-Sanchez*, we held that burglary under California Penal Code § 459 is an "aggravated felony" as that term is defined under the U.S. Sentencing Guidelines. *See* 666 F.3d at 573. However, under California law, burglary of uninhabited premises – like an office building – is second degree burglary, a crime that may be punished either as a felony or as a misdemeanor. *See* Cal. Penal Code §§ 460, 461; *People v. Williams*, 233 P.3d 1000, 1042 n.6 (Cal. 2010). Accordingly, the government's interest in investigating a burglary of an office building is not as strong as the district court's reasoning suggests. *See Bryan*, 630 F.3d at 829 ("[T]here was no substantial government interest in using significant force to effect [plaintiff's] arrest for . . . misdemeanor violations.").

---

*United States 2013*, https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/property-crime/property-crime-topic-page/propertycrimemain_final.

Second, even if the officers were investigating a felony, this label is not dispositive. Although the government's interest in apprehending criminal suspects is certainly stronger when the suspect is suspected of having committed a felony, *see Miller*, 340 F.3d at 964, we have noted that "[a] wide variety of crimes, many of them nonviolent, are classified as felonies," *Chew*, 27 F.3d at 1442. As the Supreme Court has recognized,

> [W]hile in earlier times the gulf between the felonies and the minor offences was broad and deep, today the distinction is minor and often arbitrary. Many crimes classified as misdemeanors, or nonexistent, at common law are now felonies . . . . [T]he assumption that a 'felon' is more dangerous than a misdemeanant [is therefore] untenable.

*Garner*, 471 U.S. at 14 (citations omitted). As set forth above, a non-residential burglary is not an inherently dangerous crime, and "the fact that an unarmed suspect has broken into a dwelling at night does not automatically mean [s]he is physically dangerous." *Id.* at 21.

Accordingly, we conclude that this factor weighs only slightly in favor of finding that the City's countervailing interest rendered its use of force objectively reasonable.

### d.  Other Factors

As noted above, the foregoing *Graham* factors are not exclusive, and, in evaluating the importance and legitimacy of the City's interest in using force, we must "examine the totality of the circumstances and consider whatever specific

factors may be appropriate in a particular case, whether or not listed in *Graham*." *Glenn*, 673 F.3d at 872 (citation omitted).

One such additional factor is whether or not a warning was given before force was used. *See Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012) ("[W]e have held that 'the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test.'" (quoting *Deorle*, 272 F.3d at 1284)). Here, we agree with the district court's conclusion that Sergeant Nulton's warnings prior to releasing Bak weighs in favor of finding that the government's use of force was reasonable. *See Forrester v. City of San Diego*, 25 F.3d 804, 808 (9th Cir. 1994) (holding that use of force was not unreasonable, in part because protesters were given warning and instructions on how to comply before force was applied).

However, the fact that Lowry did not hear these warnings has some bearing on the weight we accord this factor. For example, in *Nelson*, we held that, even though the officers gave warnings before shooting pepperball guns, the fact that the orders could not be heard over the din of the crowd weighed against a finding that the use of force was reasonable. 685 F.3d at 882–83. Accordingly, even though we conclude that this factor weighs in favor of the government, we find that it does so only slightly.

Another factor pertinent to this case is the availability of other tactics to effect the search.[9] *See Bryan*, 630 F.3d at 831

---

[9] Although most of the case law in this area has been developed in the context of an arrest, *i.e.*, a constitutional "seizure," that law applies equally in the search context. If anything, the justification for using force in a search is even less than in making an arrest.

(noting that, in evaluating whether a use of force was reasonable, "we have held that police are required to consider what other tactics if any were available to effect the arrest") (citations and brackets omitted); *see also Smith*, 394 F.3d at 701 (explaining that police must consider less intrusive alternatives). While officers "are not required to use the least intrusive degree of force possible," *Forrester*, 25 F.3d at 807, the availability of "clear, reasonable and less intrusive alternatives" to the force employed "militate[s] against finding [the] use of force reasonable," *Bryan*, 630 F.3d at 831. Here, taking the evidence in the light most favorable to Lowry, a reasonable jury could find that Sergeant Nulton had at least one alternative available: namely, he could have kept Bak on lead, a tactic that would have allowed him to exercise greater control over Bak. Indeed, the SDPD's Operation Manual for its Canine Unit requires officers to keep police dogs on lead during residential searches, "unless the handler can reasonably determine there are no residents or animals in the home." For the purposes of summary judgment, the availability of this alternative tactic weighs slightly against a finding that the City's use of force was objectively reasonable.[10]

### 3. Weighing the Conflicting Interests

Whether deploying Bak in this case was "objectively reasonable" turns on "whether the degree of force used was necessary, in other words, whether the degree of force used was warranted by the governmental interests at stake." *Deorle*, 272 F.3d at 1282 (citing *Graham*, 490 U.S. at 396).

---

[10] Although not developed in this record, it may also be that the officers could have visually scanned the suite with night-vision goggles before sending in the police dog off lead.

"To put it in terms of the test we apply: the degree of force used by [the police] is permissible only when a strong government interest *compels* the employment of such force." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003) (quoting *Deorle*, 272 F.3d at 1280 (alterations and emphasis in original)).

Here, when responding to an alarm at an office building at night, police officers encountered an open door to an office, announced their presence, and received no reply. The question on appeal is whether a reasonable jury could find that under these circumstances the officers used excessive force when they deliberately unleashed a police dog that they knew might well "rip[] [the] face off" any individual who might be present in the office. As the preceding discussion makes plain, a reasonable jury could find that the City's use of force in this case was not an objectively reasonable one. The intrusion on Lowry's liberty interests was severe. By contrast, taking the evidence in the light most favorable to Lowry, a reasonable jury could find that the City had little interest in deploying such a serious use of force: three of the five factors used to assess the City's interests – including the most important factor, the absence of any immediate threat to the safety of the officers or any other person – weigh against a finding that its use of force was objectively reasonable, while the other two weigh only slightly in the City's favor. Accordingly, a reasonable jury could find that the deployment of Bak was not an objectively reasonable use of force. *See Torres*, 648 F.3d at 1126. Because the City has failed to show that there are no questions of fact as to whether the use of force was reasonable, *see Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 538 (9th Cir. 2010), summary judgment for the City was not warranted.

## B.  The City's Liability

We now turn to the second prong of the *Monell* inquiry: whether the City can be held responsible for Lowry's constitutional injury.  *Chew*, 27 F.3d at 1439.  Municipalities may not be held vicariously liable for the unconstitutional acts of their employees under the theory of *respondeat superior*.  *See Monell*, 436 U.S. at 690–91.  Rather, in order to prevail on a § 1983 claim against a city, a plaintiff must prove that the constitutional injury was inflicted pursuant to city policy, regulation, custom, or usage.  *Id.*; *see also Chew*, 27 F.3d at 1444.  "City policy 'causes' an injury where it is 'the moving force' behind the constitutional violation, or where 'the city itself is the wrongdoer.'" *Id.* at 1444 (quoting *Monell*, 436 U.S. at 694, *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 122 (1992)).  However, "City policy need only cause the constitutional violation; it need not be unconstitutional per se."  *Chew*, 27 F.3d at 1444 (citation and brackets omitted).

Here, there is no dispute that the City's bite-and-hold policy was the "moving force" behind Lowry's constitutional injury.  The City admitted as much in its Amended Answer to Lowry's First Amended Complaint, stating that:

> at approximately 11:00 p.m. on February 11, 2010 Lowry was lawfully sleeping on the couch in her unlocked office suite located at 4603 Mission Blvd., Suite 200, San Diego, California when Sergeant Bill Nulton deployed a police services dog *in conformity with the official policies and procedures adopted by the San Diego Police Department*

and Plaintiff was bitten or scratched on her
upper lip.

Because the City concedes that Sergeant Nulton released Bak
in conformity with the SDPD's official policies and
procedures, we conclude that the City's policy was the
"moving force" behind Lowry's injury. *See Chew*, 27 F.3d at
1444–45 ("There is little doubt that a trier of fact could find
that Chew's injury was caused by city policy . . . [because]
[i]n the district court, the city conceded . . . that departmental
policy authorized seizure of all concealed suspects – resistant
or nonresistant, armed or unarmed, violent or nonviolent – by
dogs trained to bite hard and hold." (emphasis omitted)).

The City raises several unavailing arguments as to why it
is entitled to summary judgment on the issue of municipal
liability. First, it argues that Lowry's single incident provides
an insufficient basis for her *Monell* claim, citing to our
decision in *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.
1996). *Trevino*, however, is inapposite. There, we held that
"[l]iability for improper *custom* may not be predicated on
isolated or sporadic incidents." *Id.* (emphasis added). Here,
Lowry's claim is predicated not on custom, but on an official
municipal policy.

Second, the City argues that, in order to prevail on a
*Monell* claim, Lowry must prove that the City's policy
amounts to deliberate indifference of her constitutional right,
relying on our decision in *Oviatt ex rel. Waugh v. Pearce*,
954 F.2d 1470, 1477–78 (9th Cir. 1992). Once again, the
City relies on an inapplicable part of our *Monell*
jurisprudence: the "deliberate indifference" requirement
applies only to claims involving allegations of constitutional
deprivations resulting from governmental *inaction* or

*omission*, such as a failure to adequately train. *See id.* at 1474 ("[A] local governmental body may be liable if it has a policy of inaction and such inaction amounts to a failure to protect constitutional rights."). Because Lowry claims her constitutional deprivation resulted from a City policy and affirmative government conduct – training Bak to "bite and hold" and releasing Bak off-lead into Suite 201 – the "deliberate indifference" analysis does not apply.

Finally, the City argues that because there is no case law indicating that a bite-and-hold policy is unconstitutional, it cannot be held liable for Lowry's injuries. The City appears to argue that it is entitled to qualified immunity because there was no "clearly established" law holding its bite-and-hold policy unconstitutional.

The City is mistaken for two reasons. First, qualified immunity analysis is irrelevant to the issue of *Monell* liability. *See Brandon v. Holt*, 469 U.S. 464, 471 (1985) ("[A] municipality is not entitled to the shield of qualified immunity from liability under § 1983."). Second, establishing municipal liability does not require Lowry to demonstrate that the City's policy is "unconstitutional per se;" rather, she need only demonstrate that the policy was the "moving force" behind her constitutional injury. *Chew*, 27 F.3d at 1444.

Because the City conceded before the district court that Lowry's injuries were incurred "in conformity with the official policies and procedures adopted by the San Diego Police Department," we conclude that the district court erred in granting summary judgment in the City's favor on the issue of municipal liability.

**IV.**

As noted above, the Supreme Court has said that the objective reasonableness of an officer's actions in the excessive force context is a "pure question of law" only once "the relevant set of facts" has been determined. *See Scott*, 550 U.S. at 381 n.8; *see also id.* at 386 ("The car chase that respondent initiated . . . posed a substantial and immediate risk of serious physical injury to others; no reasonable jury could conclude otherwise."). Our case law following *Scott* has noted that "[b]ecause the reasonableness standard 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment . . . in excessive force cases should be granted sparingly.'" *Torres*, 648 F.3d at 1125 (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)). In *Torres*, for example, the question was whether a police officer's mistake of pulling out and firing her gun rather than her taser was "objectively unreasonable under the totality of the circumstances," including the exigencies of the situation and her past training on where each weapon was holstered. *Id*. at 1124. In that case, the district court discounted the officer's previous training and found that her accidental shooting was the result of an action that she was forced to take in a tense situation. *Id*. at 1225. We reversed, holding that a reasonable jury "could weigh the significance of [the officer's] risk awareness and daily practice differently from the way in which the district court weighed those factors" and could find that, rather than a tense situation forcing the officer to act, the officer's "poor judgment and lack of preparedness caused her to act with undue haste." *Id*. at 1225–26. In other words, we reversed because a reasonable juror could have made different factual inferences than the district court.

Similarly, the district court here gave one interpretation regarding how to weigh the different factors at issue. It found that the officers faced a tense situation, unsure of who was behind an open office door in a dark office building, and that they cautiously used a police dog to apprehend a potential burglar and then quickly called back the dog when they realized Lowry was not a threat. *Lowry v. City of San Diego*, 2013 WL 2396062, at \*5–\*6 (S.D. Cal. May 31, 2013). As in *Torres*, however, a reasonable juror could make wholly different factual inferences: the officers, responding to a routine alarm and not faced with a burglar who already had engaged in threatening behavior, or who had attempted to evade arrest, or who had committed an inherently dangerous crime, unleashed a police dog that the officers believed was likely to rip a person's face off, even if she were an innocent employee of a business who had fallen asleep in her office late at night. It is the jury's role to decide which of these or other inferences should be drawn from the facts in the record. The City has thus failed to show that there are no questions of fact as to whether its use of force was reasonable. *See Espinosa*, 598 F.3d at 538. Given that there is no dispute that the City's "bite and hold policy" was the moving force behind Lowry's constitutional injuries, the City was not entitled to summary judgment. We reverse and remand this case for further proceedings.

**REVERSED and REMANDED.**

CLIFTON, Circuit Judge, dissenting:

Put yourself in the shoes of Sergeant Bill Nulton of the San Diego Police Department. Late one Thursday night in February, around 11:00 pm, you are dispatched to respond to a burglar alarm that has gone off at a two-story commercial building. You arrive at the scene within two or three minutes of getting the call, together with your police service dog, Bak, and two other officers. Approaching the building, you do not see anyone leaving the building or the parking lot. You inspect the building and see that two doors on the second floor are open. You go to the second floor and determine that one open door leads to a bathroom, which is empty. Another door is closed and locked. The remaining door leads to Suite 201. It is propped open. The building is dark. You cannot see inside and do not know whether anyone is there. You yell loudly, "This is the San Diego Police Department! Come out now or I'm sending in a police dog! You may be bitten!" There is no response. You wait between 30 and 60 seconds, but still no response. You repeat the same warning one or two more times. Again, no response. Because nobody has responded to the warnings, you are concerned that if there is someone inside the building who triggered the alarm, that person may be a burglar lying in wait. You have no way of knowing whether that person is armed. What would you do?

Unfortunately for Sgt. Nulton and for all law enforcement officers within the Ninth Circuit, if you release your trained service dog and follow him with a flashlight to search for a suspect, you might wind up in trial. Thanks to the majority opinion, officers will be discouraged from protecting themselves and encouraged to risk their lives by exposing themselves to any burglar who might be armed and lying in wait, either because they cannot use a dog at all or must

remain so closely tethered to the dog that they necessarily have to expose themselves to the potentially armed burglar.[1]

I respectfully dissent.

The majority opinion dutifully and accurately recites, at 9, that we are supposed to evaluate the reasonableness of the force used "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). That is the law, but that is not what the majority actually does.

Consider the attention given in the majority opinion to the testimony of Sara Lowry that she did not hear the warnings yelled loudly and more than once by Sgt. Nulton. *See* majority op. at 17–19 & 22. I accept that to have been true; she was asleep on the couch after consuming five vodka drinks earlier in the evening. But that's not something that the officer could have known. The majority explicitly states, at 22, that the fact that Lowry did not hear the warnings diminishes the weight it is willing to give to the fact that the officer gave warnings. That is not an evaluation based on the perspective of a reasonable officer on the scene.

Similarly, the majority opinion emphasizes, at 14, that "Lowry did not pose a threat to the officers or others." *See also* majority op. at 15–17. But the officers did not know and could not have known that Lowry would be the one and only

---

[1] Alternatively, the majority opinion appears to invite you to walk away and disregard the burglar alarm and the propped door, because most alarms are false, anyway. *See* majority opinion, at 16–17 n.6. I wonder whether the majority opinion intends that police should simply not bother with responding to any alarms. I doubt that's what citizens expect.

person they would encounter inside the building. The majority opinion rests on "the 20/20 vision of hindsight." That is error.

When viewed from the appropriate perspective, there is no interpretation of the facts that could lead a jury to conclude that the use of a police dog under the circumstances was excessive force. The summary judgment entered by the district court in favor of the City should be affirmed.

## I.  Facts

The facts, from the perspective of the officers, were as follows. At approximately 10:40 pm on the night of Thursday, February 11, 2010, a burglar alarm went off in a two-story office building in San Diego. Three police officers arrived within minutes of dispatch to find a darkened building and, on the second-story balcony, two open doors, including one that was propped open.[2] After scaling the ground-floor gate, the officers looked around the second story for any other indication that the building was occupied by someone who belonged there, finding none. The officers determined that one of the open doors led to an empty bathroom. They announced themselves loudly, more than once, at the door that was propped open.[3] No one responded.

---

[2] Lowry contests that the door was, in fact, ajar. The district court excluded Lowry's testimony about the door, however, meaning that she has provided no admissible evidence to support her contention, as discussed in more detail below, at 43–44.

[3] Lowry disputes this fact as well, but the district court also excluded the evidence she offered on that subject, as discussed below.

At this point, the officers were forced to make a decision, aided only by the information above and a handful of common-sense assumptions. Doors do not generally open of their own accord, particularly in an empty office building. Nor do people often come to an office for a legitimate purpose at nearly 11 o'clock at night without turning on the lights. Those who do are unlikely to fail to notice if they set off a burglar alarm, especially as it was loud enough to be heard from the parking lot. And there is no obvious reason why someone who was not actively trying to hide from the police would fail to respond to a command to exit a building. In other words, the totality of the circumstances strongly suggested that if there was someone in the building, that person was likely a burglar, and possibly armed.

## II.  The use of force was reasonable

The question in an excessive force analysis is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 397. We assess reasonableness by looking at three factors: (1) "the type and amount of force inflicted," (2) "the government's interest in the use of force," and (3) the balance between "the gravity of the intrusion on the individual" and "the government's need for that intrusion." *Glenn v. Washington Cty.*, 673 F.3d 864, 871 (9th Cir. 2011) (internal citations omitted). The majority ignores *Graham*'s admonition that courts must consider reasonableness from the perspective of the officers under the circumstances and instead veers between viewing the facts from Lowry's perspective, to the exclusion of the officers', and speculating on what could have happened under different circumstances. Viewed from the appropriate perspective, all three factors of the analysis under *Graham* weigh in favor of the officers.

*A.  The type and amount of force inflicted was not severe*

The majority begins its analysis by reading into our case law a blanket rule that has never existed before.  We have never held that the use of a police dog is categorically "severe," as the majority opinion suggests, at 10.  Rather, the cases the majority cites all involved an individual analysis of the use of force under particularized circumstances.

In *Smith v. City of Hemet*, it was the Hemet Police Department itself that categorized the use of a police service dog as "intermediate" force, which by its description was "the most severe force authorized short of deadly force."  394 F.3d 689, 701–02 (9th Cir. 2005) (en banc).  That usage suggests only that intermediate force was the name used by that department for the level of force between light and deadly.  It is not a holding that requires us to consider the use of a police dog severe in every case.  To the contrary, our opinion in *Smith* went on to consider the facts in that case—facts very different from those here.  The officers in that case sicced a police dog on Smith three times, including once after he had already been pinned down, and then pepper sprayed his open wounds.  *Id.* at 702.  Similarly, in *Chew v. Gates*, the court held that "the force used to arrest Chew was severe" because the dog bit Chew three times, dragged him between four and ten feet, and "nearly severed" his arm.  27 F.3d 1432, 1441 (9th Cir. 1994).  Meanwhile, in *Miller v. Clark County*, this circuit found the use of force reasonable when a fleeing suspect suffered a dog bite that lasted between forty-five and sixty seconds, "shredded" his muscles, and went down to the bone. 340 F.3d 959, 961 (9th Cir. 2003).

Applying the case-by-case analysis employed in our previous police dog cases, the district court here properly

concluded that the force used against Lowry was "moderate." In sharp contrast to the grisly injuries in the cases cited by the majority, Lowry required only three stitches in her upper lip, and experienced no visible scarring. The contact was so brief that Sgt Nulton did not even know if contact had occurred. Even Lowry described it as "very quick." Moreover, although you might not realize it from the description in the majority opinion, Nulton did not simply let Bak go but rather followed closely behind her as she cleared the small office suite. The district court took this into consideration, noting that "Sergeant Nulton was present and immediately called the dog off upon seeing Plaintiff on the couch."

The facts of this case undermine the majority's conclusion, at 12–13, that the type of force used against Lowry was comparable to that in *Chew*. In that case, the police dog was "beyond the reach of a countermanding order" when it found the plaintiff, and dragged him at least four feet and possibly as many as ten feet before releasing him. *Chew*, 27 F.3d at 1441. "[T]he longer a dog is permitted to bite a suspect, the greater the likelihood the suspect will be injured severely." *Miller*, 340 F.3d at 963. Here, the district court properly recognized that the risk inherent in the officers' use of force was significantly lessened by Sergeant Nulton's close proximity to Bak and his ability to call her off within mere moments of contact. These circumstances cannot support a conclusion that either the type or the amount of force used was comparable to the "severe" force used in cases like *Chew* and *Smith*.

## B. *The city's interest in the use of force was strong*

On the second step of the *Graham* analysis, which asks the court to consider the City's interest in the use of force, the

majority errs by viewing the circumstances from Lowry's perspective. Generally, this step requires the court to assess "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight," considered in the totality of the circumstances. *Miller*, 340 F.3d at 964. When viewed from the appropriate perspective, all of these considerations weigh in favor of the City.

### 1.  The officers reasonably anticipated a potential threat

I begin, as does the majority, with an analysis of whether Lowry presented an immediate threat to the safety of the officers. It is irrelevant to this inquiry that Lowry "remained fast asleep on the couch" during the officers' search of the building. *See* majority op. at 15. Rather, the facts must be viewed from the perspective of the officers, who knew only that they had been called to a building showing signs of a break-in,[4] that the building was dark and that as a result any entry would be blind, and that it was nevertheless their job to enter and investigate.

---

[4] The majority's focus on the rate of false alarms is misplaced, as well as foolish. *See* majority op. at 16–17 n.6 and above at 31 n.1. The alarm may have been the reason the police arrived on the scene, but once the officers approached the building, several other factors, notably the open door and the darkened suite, suggested that something was amiss. For the same reason, the majority's attempt, at 16, to characterize the district court's finding for the officers as suggesting that "any person inside an office building where a security alarm has been tripped at night necessarily poses an immediate threat to their safety or that of others" is simply inaccurate.

Our precedents make it clear that, when confronted with signs of a burglary, investigating officers are entitled to protect their own safety. "[B]urglary and attempted burglary are considered to carry an inherent risk of violence." *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1163 (9th Cir. 2014). "Normally, when officers suspect a burglary in progress, they have no idea who might be inside and may reasonably assume that the suspects will, if confronted, flee or offer armed resistance." *Frunz v. City of Tacoma*, 468 F.3d 1141, 1145 (9th Cir. 2006). "So long as the officers have established probable cause for a burglary, '[i]n such exigent circumstances, the police are entitled to enter immediately, using all appropriate force.'" *Sandoval*, 756 F.3d at 1163 (quoting *Frunz*, 468 F.3d at 1145). While it is true, as the majority observes, that the legal issue in *Frunz* concerned a Fourth Amendment claim of warrantless entry rather than a claim of excessive force, that distinction does not contradict the factual truth of our observation in *Frunz*. Neither does it affect the analysis as to the City's interest in the use of force, where the concern is not with the nature of the force used but rather whether the suspect posed a threat to the officers. The factual reality of this threat is not dependent on the point of law at issue.

Here, the officers reasonably suspected that a burglary had taken or was taking place. They made this informed judgment not simply because a burglar alarm had been tripped, but in the totality of the circumstances, and they took reasonable steps to protect themselves. As the district court found, this factor of the analysis weighs in favor of the City.

2.   Lowry did not resist or attempt to evade arrest

The second factor of the analysis, whether Lowry was resisting or attempting to evade arrest, weighs heavily in her favor in the majority opinion, at 17–19.  It is undisputed that she "took no threatening actions (other than non-compliance with shouted orders)" towards the police.  *Glenn*, 673 F.3d at 875.  But the majority fails again to consider the perspective of the police officers.  They did not know that she was there, for she hadn't responded to their warning calls.  Neither did they know that she was the only other person in the building.

Unlike the cases relied upon by the majority opinion, the officers here did not have the benefit of being able to see the suspect and make a reasoned judgment as to whether that person was resisting or evading arrest.  Instead, they had only the information that whoever was in the building had failed to respond to their warnings.  They could not know whether the unknown occupant would resist.  On the facts of this case, from the perspective of the officers, this factor does not point either way.

3.   Burglary carries an inherent risk of violence

The final factor in assessing the use of force is the severity of the crime at issue.  As noted above, we have found burglary to "carry an inherent risk of violence," as recently as 2014.  *Sandoval*, 756 F.3d at 1163.  The fact that not all burglaries involve violence does not mean that there is no risk of violence, or that police have any way of telling before it is too late which burglars are violent and which are not.

While the majority minimizes the risks of police work, during the year in which the events of this case occurred eight

police officers were killed and 5,074 were assaulted while investigating suspicious people or circumstances, in addition to the three killed and 899 assaulted during a burglary in progress. Criminal Justice Services Division, *Law Enforcement Officers Killed & Assaulted 2010*, Tables 19 and 73, FBI, https://www.fbi.gov/about-us/cjis/ucr/leoka/2010. The majority trumpets that only seven percent of burglaries nationwide involved incidents of violence, at 19–20, but that means that approximately one in every 14 burglaries involved violence, a significant number for police officers who respond to burglary calls regularly.[5] The majority's unmerited jump from the fact that not all burglaries involve violence to the conclusion that police should not protect themselves against the possibility that violence may occur minimizes the real danger that police officers face regularly in an inherently risky job. As the district court properly concluded, this factor weighs in favor of the City.

### 4. Other relevant considerations weigh in favor of the City

The majority opinion errs again in weighing other relevant considerations: (1) whether a warning was given before force was used, and (2) whether there were alternative tactics the officers could have used. And, it entirely disregards another factor that merits consideration: the

---

[5] In 2011, San Diego police handled a total of 5,840 burglaries. *See* Automated Regional Justice Information System, *Crime Statistics*, http://crimestats.arjis.org/. As of 2014, there were 1,651 SDPD officers on full duty. Melissa Mecija, *San Diego Police Department staffing levels at lowest in over a decade*, ABC 10 NEWS, (Aug. 12, 2014), http://www.10news.com/news/san-diego-police-department-staffing-levels-at-lowest-in-over-a-decade-08122014.

physical setting and the likelihood of encountering an innocent bystander.

As to the first of these considerations, all three officers stated that a warning was given. This factor weighs strongly in favor of the City. *See Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001) ("'[T]he giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test.'"). As noted above, the majority's observation that Lowry did not hear the warning is irrelevant from the perspective of a reasonable officer on the scene. The officers had no way to anticipate the unlikely circumstance that someone would be asleep in a non-residential building late at night and therefore unable to hear a warning.

The majority opinion goes wrong regarding the warning in a second way. It cites, at 22, our decision in *Nelson* to support its conclusion to weigh this factor only "slightly" in the officers' favor, but that authority actually provides it no support. The reason that we concluded in *Nelson* that the warning should not be given much weight was because the officers issued the warning without amplification into a crowd of some 1,000 partygoers at a distance of 45 to 150 feet. *Nelson*, 685 F.3d at 872, 874. The officers on the scene were obviously aware of the setting and should have known that they could not expect people to hear a warning shouted at a distance into a rowdy crowd. That was not the setting here. A warning called into a silent three-room office suite late at night should be more than sufficient to place any occupants on alert. The officers here had no reason to expect otherwise.

The majority opinion similarly overreaches in speculating about the alternative means that the officers could have used to investigate Lowry's office suite. It asserts that Sgt. Nulton could have kept Bak on the lead so that he could have exercised greater control. *See* majority op. at 23. But the policy of allowing dogs off-lead is in place to protect officers' safety, as the officers understood. If Bak were kept on the leash, Sgt. Nulton would have been required to expose himself to whomever might have been lurking in the dark office, possibly armed. Moreover, it is far from clear that the results would have been any different had Bak been kept on the lead. Sgt. Nulton was in the room when Bak jumped on Lowry and was able to call off the dog quickly. Unless the leash was especially short—which would have minimized the utility of having a dog at all—a leash may not have kept Bak any closer to Nulton than she already was.

The majority's alternative suggestion, at 23 n.10, that the officers should have used night-vision goggles, is simply puzzling. There is no indication in the record that these officers—or any regular patrol officers—had access to that technology, typically associated with military and SWAT teams rather than local police forces. Nor is there any basis for us to conclude that use of that equipment would have been practical or beneficial. Would it have compromised the officer in any other way, such as by cutting down on peripheral vision or hindering movement? Would it have actually permitted the officer to spot a burglar who could be expected to be hiding behind a desk or in a closet? I don't know, and the majority opinion gives us no reason beyond rank speculation to believe that it knows, either.

The majority fails seriously to consider the specific context that the police officer faced and the relative risks that

he had to balance when he decided to release and follow the dog. Context matters. The majority opinion notes, at 23, for instance, that the San Diego police department's manual requires an officer to keep a police dog on a lead during a residential search, "unless the handler can reasonably determine there are no residents or animals in the home." That makes sense, because in a home the likelihood of encountering an innocent bystander who might be found and injured by the dog is obvious.

The officer involved in this case was not at a home, however. He was at a dark commercial building, late at night, where there had been no response to multiple shouted warnings. That is where he made the decision to release and follow the service dog, and that was not a location where an innocent bystander was likely to be found. It was possible that nobody was in the building, but in that case releasing the dog posed no risk of harm because there would not have been anyone to find. The risk of injury from releasing the dog mattered only if there was someone else in the building, and the likelihood of someone else in the building being unable to respond to warning shouts (or the loud burglar alarm) because she was passed out on a couch could not have seemed, from the officer's perspective, very great. None of that matters to the majority, though. The San Diego police department appreciates that there is a difference between a residence and a commercial building, but the majority opinion does not.

## C. *The degree of force used was commensurate with the City's interest*

On the last step of the excessive force inquiry, we weigh the degree of force used against the government's interest in using force. *Glenn*, 673 F.3d at 871. The discussion above

makes clear that the force used here was not severe, and the police had a compelling interest in acting to protect themselves against foreseeable danger in an uncertain situation.

## III.    There are no material disputes of fact

The majority opinion acknowledges, at 28, that the objective reasonableness of an officer's actions in the excessive force context is a "pure question of law" once "the relevant set of facts" has been determined, quoting from *Scott v. Harris*, 550 U.S. 372, 381 n. 8 (2007).  It asserts that there are questions of fact here that preclude summary judgment, but it does not identify what they are. In reality, they don't exist.  Summary judgment for the officers was appropriate and should be affirmed.

In her briefing, Lowry pointed to several purported factual disputes that she argued should preclude summary judgment: whether the door to her suite was open, whether the suite was dark, and whether the officers provided her with warning prior to entering the suite.  If these facts were in dispute, summary judgment might be inappropriate. An open door could be the difference between an overreaction to a false alarm and a reasonable response to an apparent break-in. The illumination in the office is relevant to the officers' need to protect themselves from a potential ambush.  And we have explicitly held that whether a warning was provided is one of the factors to be considered.  *See Nelson*, 685 F.3d at 882.

However, these facts are not in dispute, as Lowry presented no admissible evidence on her behalf.  The district court excluded Lowry's testimony that the door to her office suite was closed because it was not "firsthand": she did not

state that she had actually closed the door but rather relied on a belief that it always closed automatically. Similarly, the district court concluded that her testimony as to the level of illumination in the suite was "entirely speculative."[6] Finally, it concluded that Lowry lacked the proper foundation to testify as to whether Sergeant Nulton had issued a warning prior to releasing Bak, as she was asleep at the time the warning was given.

The district court's evidentiary rulings made in the summary judgment context are reviewed for abuse of discretion and can only be reversed if "both 'manifestly erroneous and prejudicial.'" *Bias v. Moynihan*, 508 F.3d 1212, 1224 (9th Cir. 2007) (internal citation omitted). Since "[g]enerally, a witness must have 'personal knowledge of the matter' to which she testifies," *Bemis v. Edwards*, 45 F.3d 1369, 1373 (9th Cir. 1995) (quoting Fed. R. Evid. 602), it was not manifestly erroneous to conclude that Lowry had no personal knowledge of events that she did not in fact witness. Therefore, we must uphold the district court's conclusions that the door was open, the suite dark, and the warning given.

Without any admissible evidence to suggest that the doors to the office suite were closed, the suite illuminated, or a warning not provided, viewing the facts in the light most favorable to Lowry does not change the analysis above. The majority contends, at 29, that a jury might draw different "inferences" from the facts, but it does not actually say what different factual finding might be made—that the door was not open, that the room was not dark, or that warnings had not

---

[6] In fact, Lowry herself testified in her deposition that it was "dark" in the suite when she went to sleep, and that there were no lights or computer screens illuminating the room.

been given. No evidence supports any of those findings. The "inferences" in question amount to the ultimate question of whether the officer's actions were objectively reasonable. That question, even the majority acknowledges, is a pure question of law. Given the facts available to the reviewing court, it is clear that the type and amount of force inflicted was moderate, the City had a strong interest in using force, and the degree of force used was commensurate with the City's interest in the use of force. As a result, the officers' actions were constitutional, and there can be no liability under *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978).

I would affirm the district court's grant of summary judgment.